UNITED STATES of America, Plaintiff-Appellee,

v.

FOUR MILLION, TWO HUNDRED FIFTY–FIVE THOUSAND, etc., et al., Defendants-Appellants,

UNITED STATES of America, Plaintiff-Appellee,

v.

THREE MILLION, SIX HUNDRED EIGHTY–SIX THOUSAND, etc., et al., Defendants-Appellants.

No. 83–5026.

United States Court of Appeals, Eleventh Circuit.

June 11, 1985.

Greene & Cooper, P.A., Marc Cooper, Miami, Fla., for Thomas J. Flood & Abel Holtz.

Stanley Marcus, Joseph A. Florio, Gregory A. Baldwin, U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HILL, KRAVITCH and SMITH *, Circuit Judges:

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. 21 U.S.C. § 881(a)(6) provides:
 (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 ....
 (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an

KRAVITCH, Circuit Judge:

This appeal involves two civil forfeiture cases, consolidated in the court below, arising under 21 U.S.C. § 881(a)(6),[1] which applies to the proceeds of narcotics transactions, and 31 U.S.C. § 5317,[2] which applies to currency transported across the borders of the United States without the filing of a required report. Acting pursuant to these two statutes, the district court ordered the forfeiture to the United States of $4,255,625.39 in currency and $3,686,639 in funds on deposit in a bank account. 551 F.Supp. 314 (S.D.Fla.1982). Claimant Beno Ghitis, whose company, Viajes Atlas, owned both the currency and the bank account, appeals from the district court's judgment, asserting that 21 U.S.C. § 881(a)(6) is inapplicable because (1) the government failed to prove a "substantial connection" between the forfeited money and narcotics transactions, (2) the money did not constitute the "proceeds" of such transactions, and (3) Ghitis had no knowledge of such transactions. Ghitis also claims that 31 U.S.C. § 5317 does not apply because (1) the forfeited money did not cross the United States border, (2) the money was not "in the process of transportation" when it was seized, (3) the funds on deposit in the bank account did not constitute a "monetary instrument," and (4) there was no evidence that whoever may have transported the money knowingly failed to file the required reports. Numerous additional claimants holding checks written on the forfeited

owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

2. 31 U.S.C. § 5317, formerly codified as 31 U.S.C. § 1102, provides, in pertinent part:
 (b) A monetary instrument being transported may be seized and forfeited to the United States Government when a report on the instrument under section 5316 of this title has not been filed or contains a material omission or misstatement.
 31 U.S.C. § 5316, formerly codified as 31 U.S.C. § 1101, requires the filing of a report whenever a person transports monetary instruments totalling more than $5,000 at one time into or out of the United States.

bank account appeal from the district court's entry of summary judgment against them.

We hold that both the currency and the funds in the bank account were forfeitable under 21 U.S.C. § 881(a)(6). The government demonstrated a "substantial connection" between the forfeited money and narcotics transactions, the money constituted the "proceeds" of such transactions, and Ghitis failed to prove that he lacked knowledge of such transactions. In view of these conclusions, we need not address Ghitis' arguments concerning the applicability of 31 U.S.C. § 5317. Finally, we hold that the district court did not err in entering summary judgment against those persons holding checks written on the forfeited bank account. We thus affirm the judgment of the court below ordering forfeiture of both the currency and the funds in the bank account to the United States.

## I. FACTS

Claimant Beno Ghitis, a citizen of Cali, Colombia, operated a travel agency and money exchange house known as Viajes Atlas. In connection with its money exchange business, Viajes Atlas held bank accounts in the United States under the name of SONAL. One such bank account was a checking account, opened in March, 1980, at the Capital Bank in Miami, Florida. The signatories on this checking account were Beno Ghitis and his parents, Altar and Sonia Ghitis. Capital Bank initially charged a service fee for the SONAL account in the amount of one-eighth of one percent of the total deposits made to the account each month.

The alleged purpose of the SONAL account was to receive deposits of United States dollars from persons who wished to "sell" the dollars to Viajes Atlas, in return for checks drawn on the SONAL account or pesos to be delivered by Viajes Atlas in Colombia. About one week after the account was opened, the bank began receiving large cash deposits to the account. The deposits ranged from $500,000 to $1,000,000, mostly in small denomination bills, and were delivered to Capital Bank's downtown Miami branch by two men identified only as "Guillermo" and "Jaime." Such deposits initially were made once a week, but soon increased in frequency to two or three times a week.

In April or May, 1980, Victor Eisenstein, an employee of Beno Ghitis, introduced himself to Capital Bank branch manager Armondo Pozo as the person who would henceforth make all deposits to the SONAL account. About two weeks later, Pozo notified Eisenstein that the bank no longer would be able to accept cash deposits to the SONAL account because the bank's bonding company refused to insure any cash amounts in the bank in excess of $1,000,000. Eisenstein informed Ghitis of the bank's decision, and Ghitis met with Pozo. Ghitis told Pozo that he was not in the drug business, but that perhaps he was dealing with people who were, unbeknownst to him, involved in the drug business. Pozo explained that he could not change the bank's policy concerning the large cash deposits, and suggested that Ghitis discuss the matter with bank president Abel Holtz.

After meeting with Ghitis, Holtz agreed, on behalf of the bank, to continue accepting the cash deposits, on the condition that the service fee for the SONAL account be increased to one-half of one percent of the total amount deposited in the account each month. Ghitis also consented to purchase a money-counting machine for use by the bank in counting the SONAL deposits. Eisenstein thereupon resumed making deposits to the account, delivering between $1,000,000 and $2,000,000 to the bank two or three times a week.

These large amounts of cash were handled in a manner that was unusual, to say the least. The cash was delivered to Eisenstein's office [3] by Colombian couriers, some

---

**3.** Sometime in July or August, 1980, the bank directed that Eisenstein make the cash deposits at the bank's main office at North Bay Village, where security apparently was tighter. Shortly thereafter, Eisenstein occupied an office, under the name "American Overseas Enterprises," on

of whom were unknown to Eisenstein. The couriers did not request, and on at least several occasions refused to accept, receipts for the cash, which consisted mostly of small and medium denomination bills. The cash was delivered to Eisenstein, and subsequently was transferred to the bank, in suitcases, cardboard boxes, duffel bags, and flight bags. Eisenstein's office was not guarded, had no security devices or special locks, and was not equipped with a safe or vault, despite the fact that large sums of cash were left in the office, sometimes overnight.

In early 1981, Eisenstein became concerned about the source of the cash he was receiving for deposit in the SONAL account. In an effort to assuage Eisenstein's concerns, Ghitis sent Eisenstein a letter, dated March 7, 1981, from Cali, Colombia. In the letter, Ghitis stated: "The monies received by us in the U.S. are in connection with exchange transactions from (as far as we know) the exporting and importing of agricultural products, raw materials, etc., sales commissions and other categories, received abroad by private individuals who are primarily from our country." SONAL's records, however, show that the dollars deposited in the SONAL account were "sold" to Viajes Atlas by Colombian citizens, none of whom maintained offices in Florida, none of whom were licensed, incorporated, or registered to do business in Florida, and none of whom were noted in records maintained by the United States Customs Service as having imported or exported materials into or out of the United States. Ghitis also wrote to Eisenstein: "Even though some of these transactions involved the handling of cash, they do not give rise to mistaken associations with illegal operations which are so fashionable these days in Florida." After receiving

Ghitis' letter, Eisenstein, in an apparent effort to "protect" himself, drafted and mailed to himself a letter of resignation.

Meanwhile, in February, 1981, Ghitis again met with Pozo, who by then had become vice-president of the bank. Ghitis asked Pozo if the government could come in and seize the money in the SONAL account. When Pozo said that such a seizure was possible, Ghitis asked whether the bank would be willing to make SONAL a loan to cover the funds on deposit in the account and thereby prevent a forfeiture.[4] Pozo replied that such a loan was out of the question. Ghitis' request for a loan was referred to Abel Holtz, who found the request "unusual for banking" and denied it. Ghitis also asked Holtz to set up a meeting between Ghitis and government agents, but did not contact or attempt to contact any government agents himself.

By August, 1981, the United States Customs Service had begun to investigate the source of the cash deposits being made to the SONAL account. Eisenstein agreed to cooperate with the Customs Service investigation, allowing Customs agents to have access to his office and to monitor telephone conversations between him and Ghitis, and providing the agents with the identities of those couriers who were known to Eisenstein. Eisenstein also turned over to a Customs agent his still-sealed letter of resignation.

Sometime in August, Ghitis and Abel Holtz discussed the large amounts of cash regularly being deposited in the SONAL account. Holtz expressed concern over the bank's "exposure" under such circumstances. Ghitis denied any drug connections, but again voiced his suspicion that the money he was receiving might have some involvement with drug transactions.[5] Ghitis subsequently advised Eisenstein, and Ei-

the fourth floor of the same building in which the bank's North Bay Village office was located.

4. Ghitis apparently intended to replace the funds on deposit in the SONAL account with the proceeds of the bank loan, thus giving the bank priority over the funds in the account and potentially preventing forfeiture of the funds to the government.

5. After this conversation with Ghitis, Holtz increased the service fee for the SONAL account to a flat fee of $300,000 per month, payable twice monthly. The flat fee was made retroactive to May 1, 1981.

senstein notified Customs agents, that Ghitis would come to the United States to discuss the SONAL account if he received assurances that he would not be arrested. The Customs agents replied, however, that they could not give such assurances.

On August 19, Customs agents set up surveillance at Eisenstein's office. Eisenstein consented to the placement of a tape recorder in his leather pouch, and allowed Agent Fernandez to be present in the office to observe the deliveries of cash for deposit in the SONAL account. Around noon, Alberto Rodriguez,[6] a courier for Carlos Molina, a Colombian businessman and money exchanger, arrived at Eisenstein's office. Upon Rodriguez' arrival, Fernandez left the office and waited in a coffee shop downstairs. A short while later, Eisenstein and Rodriguez met Fernandez at the coffee shop and asked him to help unload some packages. The three men walked to a nearby parking lot, where Rodriguez pointed to a maroon 1981 Chevrolet Caprice with a Florida license plate.[7] Rodriguez handed a set of keys to Eisenstein, said, "That's the car," and walked away. Eisenstein and Fernandez opened the trunk of the car, removed three cardboard boxes and one brown package, and carried them up to Eisenstein's office. Eisenstein and Fernandez then returned downstairs, where they were met by Rodriguez. Rodriguez took the keys back from Eisenstein and drove off in the Caprice.

Eisenstein later told Fernandez that he had asked Rodriguez to produce identification, and that Rodriguez had done so reluctantly. Eisenstein also related that Rodriguez had said that the boxes contained $2,717,789 in cash. Late in the afternoon on August 19, Eisenstein deposited $1,313,000 of the cash from the boxes, along with $844,000 in cash that had been delivered the day before by Brigitte Edelman, in the SONAL account. The remainder of the cash was left in the office. At about 4:30 p.m., Eisenstein, Fernandez, and Ghitis engaged in a three-way telephone conversation, during which Ghitis again said that he wanted to talk to the government agents, but that he would not do so without a promise of immunity. Fernandez replied that he could not grant immunity to Ghitis, but that he did not know of any arrest warrants against Ghitis.[8]

The next day, August 20, Fernandez observed Rodriguez, accompanied by another man later identified as Hector Gomez,[9] arrive at Eisenstein's office in the maroon Caprice. Rodriguez entered the building, while Gomez walked to a location about 50 to 75 yards away and watched the car. Eisenstein and Rodriguez soon emerged from the building, removed two large cardboard boxes from the trunk of the car, and took the boxes inside. Rodriguez and Gomez then left in the Caprice. Eisenstein later told Fernandez that, according to Rodriguez, the two boxes contained $2,000,000. Other deliveries were made the same day by a man identified only as "Mono," who delivered $200,000, and by Doria Rospenia, who delivered $10,000.

At about 6 p.m. on August 20, Eisenstein spoke with Beno Ghitis by telephone, while Fernandez listened on an extension. Eisenstein asked Ghitis where all of the cash was coming from. Ghitis replied that he

---

6. Customs agents later obtained, from the Florida Department of Highway Safety and Motor Vehicles, a copy of a Florida driver's license bearing Rodriguez' picture and the name, "Carlos Alberto Torro." The address on the driver's license was an empty warehouse in Miami.

7. The vehicle registration for the maroon Caprice contained the name, "Carlos Alberto Torro," and the address of an empty warehouse. *See supra* note 6.

8. After the events relevant to this case occurred, Ghitis and Eisenstein were indicted and convicted by a jury on charges of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and felonious failure to file currency transaction reports with the Internal Revenue Service, in violation of 31 U.S.C. §§ 1059, 1081, and 1082 (now codified at 31 U.S.C. §§ 5322, 5313). Their convictions were reversed by this court on appeal. *See United States v. Eisenstein,* 731 F.2d 1540 (11th Cir.1984).

9. Customs agents later discovered that a Florida driver's license issued to Gomez contained a Miami address that did not exist.

didn't know where the cash was coming from, that Eisenstein shouldn't worry about it, but that he should not deposit any more cash in the SONAL account. Ghitis also told Eisenstein that Rodriguez knew that Eisenstein "had been with Customs." Eisenstein became visibly upset at this remark.

Meanwhile, Customs agents had been following the maroon Caprice utilized by Rodriguez and Gomez. On August 19, after delivering the cash to Eisenstein's office, Rodriguez drove to a ticket agency where he purchased a one-way ticket on Avianca Airlines flight 65, bound from Miami to Colombia, on September 2, 1981.[10] In the evening of August 20, Gomez drove the car to Miami Beach, where he parked the car in a no-parking zone, got out, looked around, and briskly walked away. Several days later, the car was towed by Miami Beach police to a local "pound." A search of the car revealed a secret compartment, operated by a hidden latch, behind the rear seat. In the glove compartment of the car, the police found two Avianca Airlines tickets for one-way flights from Miami to Medellin, Colombia, on August 29, 1981.[11] The car never was claimed by either Rodriguez or Gomez.[12]

At about 7:00 p.m. on August 20, Customs agents, with Eisenstein's permission, removed from Eisenstein's office for inspection $3,686,639 in cash, some of which had been left unguarded in the office since the day before, and several discarded boxes and bags. Later that night, the agents told Eisenstein that they were going to seize the cash.[13] The next day, August 21, the agents obtained from a federal magistrate a warrant for the seizure of the funds on deposit in the SONAL account. Upon service of the warrant, Capital Bank issued to the government a cashier's check in the amount of $4,255,625.39.

Subsequent inspection of SONAL's records showed that, between January 1 and August 21, 1981, a period of less than eight months, deposits of cash to the SONAL account by Eisenstein totalled $242,238,739. Of this amount, $191,000,000 was delivered to Eisenstein by Alberto Rodriguez, acting on behalf of Carlos Molina. On August 19 and 20, Eisenstein received $7,012,799 in small and medium denomination bills for deposit in the SONAL account. Of this amount, $4,781,799 was delivered by Rodriguez and Hector Gomez.

## II. DISCUSSION

### A. Did a "Substantial Connection" Exist Between the Forfeited Money and Narcotics Transactions?

Ghitis first argues that the government failed to prove a "substantial connection" between the forfeited money and narcotics transactions,[14] and that the

---

**10.** Rodriguez used the name, "Carlos Alberto Torro," and paid for the ticket with 300 one-dollar bills. The ticket never was used.

**11.** The two tickets were issued to Hector Gomez and "Gilberto Rua." The tickets never were used.

**12.** For purposes of this appeal, we are concerned only with the ultimate determination whether the money was forfeitable under 21 U.S.C. § 881(a)(6). Hence, although the impoundment and search of the maroon Caprice took place after the initial seizure of the money by the Customs agents on August 21, we may consider such evidence in evaluating the decision of the court below.

The government attempted to establish at trial that narcotics detection dogs "alerted" to the scent of narcotics emanating from the secret compartment in the car. The district court,

however, rejected such testimony as "interesting and innovative but unconvincing."

**13.** The agents made the decision to seize the cash after narcotics detection dogs "alerted" to the scent of narcotics emanating from the boxes containing the cash. The district court, however, declined to give weight to the government's testimony concerning the narcotics scent. *See supra* note 12.

**14.** The "substantial connection" requirement appears not in the statute itself, but in the legislative history:

Due to the penal nature of forfeiture statutes, it is the intent of these provisions that property would be forfeited only if there is a *substantial connection* between the property and the underlying criminal activity which the statute seeks to prevent.... Similarly, any moneys, negotiable instruments, or secu-

district court thus erred in entering judgment for the government. The problem with Ghitis' argument, however, is that the government need not prove such a connection. Rather, in forfeiture actions under 21 U.S.C. § 881(a)(6), the government merely must demonstrate the existence of *"probable cause for belief* that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute," that is, the exchange of a controlled substance. *United States v. $364,960 in United States Currency,* 661 F.2d 319, 323 (5th Cir.Unit B 1981) (emphasis added).[15] "Probable cause" refers to "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *Id.; United States v. One 1978 Chevrolet Impala,* 614 F.2d 983, 984 (5th Cir.1980).[16] In our view, the government adequately met its burden.[17]

■ The evidence at trial revealed that the forfeited currency and funds on deposit were part of a huge amount of money routed through the SONAL account between March, 1980, and August, 1981. The totality of the circumstances surrounding the deposits to the SONAL account leads us to conclude that the money probably was drug-generated. We find particularly significant the evidence indicating that (1) the money was delivered to the office of SONAL's agent, Eisenstein, by Colombian couriers, many of whom were unidentified, (2) the couriers did not request, and on at least several occasions refused to accept, receipts for the cash, (3) on at least one occasion, the couriers delivered the cash in the trunk of a car equipped with a secret compartment, and, when followed, abandoned the car, (4) the cash consisted of small and medium denomination bills, and was delivered in suitcases, cardboard boxes, duffel bags, and flight bags, (5) Eisenstein's office was unguarded and devoid of security devices, (6) the alleged "sellers" of the cash were not on record with the United States Customs Service as exporters or importers, (7) the bank charged an unusually high service fee for the SONAL account, (8) Ghitis consented to purchase a money-counting machine for the bank's use in counting the deposits to the SONAL account, and (9) Ghitis requested an "unusual" loan to protect the funds on deposit in the SONAL account from forfeiture. This evidence, coupled with the sheer amount of money involved, namely, over $242,000,000 during a period of less than eight months, established probable cause to believe that a "substantial connection" existed between the forfeited money and narcotics transactions.[18]

■ Ghitis alleges that the government's evidence was circumstantial, not direct, and that the government failed to produce evi-

rities that were used or intended to be used to facilitate any violation of the Controlled Substances Act would be forfeitable only if they had some *substantial connection* to, or were instrumental in, the commission of the underlying criminal activity which the statute seeks to prevent.
Joint Explanatory Statement of Titles II and III of the Psychotropic Substances Act of 1978, Pub.L. No. 95–633, 92 Stat. 3768 (codified in scattered sections of 18 and 21 U.S.C.), *reprinted in* 1978 U.S.Code Cong. & Ad.News 9496, 9518, 9522 (emphasis added).

**15.** Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

**16.** The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions

of the former Fifth Circuit rendered prior to October 1, 1981.

**17.** In this circuit, the existence of probable cause to support a forfeiture is a matter of law, and thus subject to plenary review on appeal. *See United States v. $364,960 in United States Currency,* 661 F.2d 319, 323 & n. 12 (5th Cir.Unit B 1981).

**18.** Ghitis argues that, if we uphold the district court's finding of probable cause, any large amounts of cash held by Latins in Miami automatically will be subject to forfeiture under 21 U.S.C. § 881(a)(6). We see little resemblance, however, between the various scenarios described by Ghitis and the instant case. We emphasize that, here, it is the totality of the circumstances, and not merely the nationality of the couriers or the amount of money involved, that gives rise to the finding of probable cause.

dence of a connection with a particular narcotics transaction. Both of these claims are irrelevant. This court's predecessor has held that, in a forfeiture action under 21 U.S.C. § 881(a)(6), circumstantial evidence can suffice to support a finding of probable cause. *See United States v. $364,960 in United States Currency*, 661 F.2d at 324–25. Furthermore, nothing in the statute requires evidence of a particular narcotics transaction, and we decline to impose such a requirement here.[19]

 Ghitis also contends that the district court erred when it took into account, as a "common experience consideration," the fact that Miami has become a center for drug-smuggling and money-laundering. Such observations, however, were not improper. As this court recently has emphasized in another context, probable cause "must be judged not with clinical detachment but with a common sense view to the realities of normal life." *Wilson v. Attaway*, 757 F.2d 1227 (11th Cir.1985); *United States v. Herzbrun*, 723 F.2d 773, 775 (11th Cir.1984).

 Once the government demonstrated probable cause, the burden of proof shifted to Ghitis. *See* 21 U.S.C. § 881(d);[20] 19 U.S.C. § 1615;[21] *United States v. $364,960 in United States Currency*, 661 F.2d at 322 n. 10. It was Ghitis' burden to establish, by a preponderance of the evidence, that the money had not been used in violation of the statute. *See United States v. $22,287, United States Currency*, 709 F.2d 442, 446 (6th Cir.1983); *cf. United States v. One 1975 Ford F100 Pickup Truck*, 558 F.2d 755, 756 (5th Cir.1977) (discussing 49 U.S.C. § 782 and 19 U.S.C. § 1595a, two analogous forfeiture statutes). Ghitis' evidence on this issue primarily consisted of testimony relating to Colombian currency laws and coffee shortages. The district court found this evidence unpersuasive, and so do we. We therefore hold that the district court did not err in ruling that a "substantial connection" existed between the forfeited money and narcotics transactions.[22]

**19.** At least two other circuits have upheld forfeitures under 21 U.S.C. § 881 despite the absence of evidence relating the forfeited property to a particular drug transaction. In *United States v. Brock*, 747 F.2d 761 (D.C.Cir.1984), the forfeited property consisted of jewelry found in the attic of a house. Drugs, money, a gun, and narcotics equipment were found in a different room of the same house. The D.C. Circuit noted that "[t]here was no direct evidence to connect the jewelry with the claimant's alleged narcotics activities." *Id.* at 762. The court nevertheless affirmed the judgment of forfeiture, explaining that "[c]ircumstantial evidence and inferences therefrom are good grounds for a finding of probable cause in a forfeiture proceeding." *Id.* at 763.

In *United States v. $13,000 in United States Currency*, 733 F.2d 581 (8th Cir.1984), the forfeited money was found in the shoulder bag of a person who previously had been charged with conspiracy to distribute cocaine, but had been released on bond. Also found in the shoulder bag were plastic bags, tape, and rubber bands. The seizure was made at the Minneapolis airport, where the person, using an assumed name, was about to board an airplane for New York. The person also had placed several toll calls to the same apartment in New York that he had called just prior to his arrest on the cocaine conspiracy charge. From this circumstantial evidence, and in the absence of any direct evidence of narcotics, the Eighth Circuit concluded that the person "intended to travel to New York to furnish the $13,000 in exchange for a controlled substance." *Id.* at 585.

**20.** 21 U.S.C. § 881(d) provides, in pertinent part:

(d) The provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws ... shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this subchapter, insofar as applicable and not inconsistent with the provisions hereof....

**21.** 19 U.S.C. § 1615 provides, in pertinent part:

In all suits or actions (other than those arising under section 1592 of this title) brought for the forfeiture of any vessel, vehicle, aircraft, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant.... *Provided,* That probable cause shall be first shown for the institution of such suit or action, to be judged of by the court....

**22.** Ghitis argues that he satisfied his burden of proving a legitimate source for the money by demonstrating that most of it came from Carlos

### B. Did the Forfeited Money Constitute the "Proceeds" of Narcotics Transactions?

Ghitis' next argument is that the forfeited money did not constitute the "proceeds" of narcotics transactions, in that the money had been exchanged for goods of equivalent value, i.e., pesos. According to Ghitis, even assuming that the "sellers" of United States dollars to SONAL were drug dealers, the government should have attempted to find and seize the pesos that ended up in the hands of the drug dealers. Having failed to do so, Ghitis argues, the government could not seize the dollars acquired by SONAL in value-for-value exchanges.

■ We find this argument meritless. The statute authorizes the forfeiture of "all proceeds traceable to [a narcotics] exchange," 21 U.S.C. § 881(a)(6), and does not limit forfeiture to property found in the hands of a drug dealer. Were the statute so limited, Congress hardly would have found it necessary to include the so-called "innocent owner" defense discussed infra, at section II.C. of this opinion. In addition, the legislative history of 21 U.S.C. § 881(a)(6) provides:

> [I]f such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture....

Joint Explanatory Statement of Titles II and III of the Psychotropic Substances Act of 1978, Pub.L. No. 95–633, 92 Stat. 3768 (codified in scattered sections of 18 and 21 U.S.C.), reprinted in 1978 U.S.Code Cong. & Ad.News 9518, 9522 (emphasis added). Congress clearly contemplated the forfeiture of property that once belonged to drug dealers, but subsequently was transferred, via "legitimate transactions," to third parties.

■ Ghitis contends that, as a result of the district court's ruling in this case, every value-for-value exchange involving the "proceeds" of narcotics transactions will multiply the total amount of money forfeitable to the government under 21 U.S.C. § 881(a)(6). For example, Ghitis poses in his brief on appeal the following hypothetical:

> A drug dealer has a drug-generated $100 bill. He asks a cohort to exchange the $100 bill for five $20 bills. According to the government's argument, both the $100 bill in the cohort's hands and the five $20 bills in the dealer's hands are "proceeds" subject to forfeiture. Although only $100 was drug-generated, $200 are now forfeitable. If the cohort goes to a second cohort and changes the $100 bill for ten $10 bills, $300 is now forfeitable—the five $20 bills in the dealer's hands, the ten $10 bills in the first cohort's hands, and the $100 bill in the second cohort's hands.

We perceive no problem with the hypothetical posed by Ghitis. In our view, those who knowingly do business with drug dealers do so at their own risk. Ghitis' proposed interpretation of 21 U.S.C. § 881(a)(6) would completely insulate money-launderers, and others who knowingly do business with drug dealers, from possible forfeiture of their ill-gotten gains. We reject such an unduly restrictive interpretation of the statute, and hold that the forfeited money here constituted the "proceeds" of narcotics transactions.[23]

### C. Did Ghitis Have Knowledge of Narcotics Transactions?

Ghitis' final claim is that he had no knowledge of the connection between the

Molina, who ran a "reasonably reputable" money exchange house. We do not agree. That Ghitis may not have received the money directly from drug dealers does not prove that the money was free from a substantial drug connection.

23. Even if we agreed with Ghitis' interpretation of the statute, we would not reverse the decision of the court below. We find no evidence in the record indicating that Ghitis, or SONAL, gave pesos in exchange for the forfeited money prior to the seizure of the money by the government. Rather, the record supports an inference that significant time normally elapsed between the deposit of dollars in the SONAL account and the transfer of pesos, or, alternatively, the cashing of checks drawn on the account, in exchange for those dollars.

forfeited money and narcotics transactions, and thus was entitled to assert the so-called "innocent owner" defense contained in 21 U.S.C. § 881(a)(6). The statute provides that "no property shall be forfeited ... to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." *Id.* According to Ghitis, the district court erroneously rejected his "innocent owner" defense on the grounds that he "knew or reasonably should have known" that the money being deposited in the SONAL account was drug-generated.

We agree with Ghitis that the application of the statutory "innocent owner" defense turns on the claimant's actual knowledge, not constructive knowledge.[24] Nevertheless, we reject Ghitis' "innocent owner" claim for two reasons. First, we do not read the district court's decision the same way that Ghitis does. Although the district court twice opined that Ghitis "should have known" that the money was drug-generated, the court also found that Ghitis' actions "indicated a tacit acknowledgement of his disquieting belief that these large cash deposits were coming to the SONAL depositor (Eisenstein) by way of Colombian couriers carrying narcotic-generated cash," and that Ghitis had a "gnawing belief that the funds being dealt with were tainted." Furthermore, in explaining the standard of law to be applied to this issue, the court stated:

> Thus, the claimant Ghitis ... could bring about the dissolution of the seizure even if the government succeeds in establishing probable cause in the view of the fact finder by showing that SONAL *had no knowledge and had given no consent* to improper acts or omissions.... Where it is reasonable to believe that an owner of property *is aware* that the property is the proceeds of narcotics transactions or involved in the narcotics exchange business, that owner is not an innocent owner.

551 F.Supp. at 323 (emphasis added). Therefore, contrary to Ghitis' assertion, we conclude that the district court properly applied the "actual knowledge" standard, and found sufficient evidence to support an inference that Ghitis had actual knowledge of the drug taint.[25]

Second, and more importantly, Ghitis' argument ignores the statutory requirement that the claimant, and not the government, bear the burden of proof on

---

**24.** The government argues that we should replace the "actual knowledge" standard with the "negligence" standard discussed by the Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). In *Calero-Toledo,* the Court addressed a due process challenge to a forfeiture, under a Puerto Rico statute, of property belonging to an alleged "innocent owner." The Court upheld the forfeiture, but stated in dicta that "[i]t ... has been implied that it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent.... Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done *all that reasonably could be expected* to prevent the proscribed use of his property...." *Id.* at 689, 94 S.Ct. at 2094–95 (emphasis added).

Because *Calero-Toledo* did not involve the statutory "innocent owner" defense contained in 21 U.S.C. § 881(a)(6), we question the government's invocation of the *Calero-Toledo* dicta in this case. Nevertheless, because we find that Ghitis failed to meet the "actual knowledge" standard, we leave for another day the question of the applicability of the *Calero-Toledo* dicta to forfeiture actions under 21 U.S.C. § 881(a)(6). *See United States v. $47,875 in United States Currency,* 746 F.2d 291, 292 n. 1 (5th Cir.1984).

**25.** We therefore reject Ghitis' contention that the district court's decision jeopardizes the status of cash as "legal tender." On the contrary, we interpret the district court's decision as affecting only those who *knowingly* engage in business with drug dealers.

Like the district court, we find ample evidence in the record to support an inference that Ghitis knew about the drug taint. Perhaps the best evidence consists of Ghitis' own words and deeds; Ghitis' comments to Pozo and Holtz, his request for a loan to "protect" the funds on deposit in the SONAL account, and his refusal to enter the United States without a guarantee of immunity, all indicate that Ghitis entertained more than a mere suspicion that the money SONAL was receiving was drug-generated.

the "innocent owner" defense. Under 21 U.S.C. § 881(a)(6), the government need not prove, and the district court need not find, that the claimant *had* actual knowledge. Rather, it is the claimant's responsibility to prove the *absence* of actual knowledge. Whatever the district court may have found concerning Ghitis' state of knowledge in this case, the court certainly did not find the absence of knowledge essential to Ghitis' "innocent owner" defense. On the contrary, the court found that "SONAL and Ghitis have failed to establish that they are innocent owners of either of the currencies." 551 F.Supp. at 323. Consequently, we decline Ghitis' invitation to reverse the district court on this ground.

D. Did the Check Holders Have Standing to Contest the Forfeiture of the Funds on Deposit in the SONAL Account?

The sole remaining issue on appeal is whether the district court erred in entering summary judgment based on lack of standing against numerous claimants holding checks written on the forfeited SONAL bank account. To have standing to contest a forfeiture under 21 U.S.C. § 881(a)(6), a claimant must demonstrate "an ownership or possessory interest in the property seized." *United States v. $500,000*, 730 F.2d 1437, 1439 (11th Cir.1984).[26] The check holders argue that they had an interest in the funds on deposit sufficient to provide them with standing to contest the forfeiture. We do not agree.

The check holders' argument is based on the proposition that, under Florida law, a check is an equitable assignment of the funds on deposit in a bank account. The cases cited in support of this proposition, however, either do not involve checks or predate Florida's enactment of the Uniform Commercial Code. Under the Uniform Commercial Code, it is clear that a check does *not* operate as an assignment of funds. *See* Fla.Stat.Ann. § 673.409(1) ("A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it."). The Comment to this Code section emphasizes that "a check or other draft does not of itself operate as an assignment *in law or equity.*" U.C.C. § 3–409 Comment (emphasis added).

Because the SONAL checks, under Florida law, represented neither a legal nor an equitable assignment of the funds on deposit in the account, we hold that the district court properly entered summary judgment against the check holders.[27]

III. CONCLUSION

On the basis of the foregoing discussion, the judgment of the court below is hereby AFFIRMED.

---

26. The claimants here argue that an ownership or possessory interest in the property is not required, but that, according to the legislative history of the statute, a mere equitable interest will suffice. Whatever the merits of this argument, we are bound by this court's prior decision in *United States v. $500,000*. In any event, as our discussion in the text makes clear, the claimants in this case cannot prevail under either standard.

27. Claimant Raymond Takiff, who served as Beno Ghitis' attorney in the district court, cites *United States v. Currency Totalling $48,318.08*, 609 F.2d 210 (5th Cir.1980), in support of his contention that an assignment of funds to an attorney in exchange for present and future services can provide standing to contest a forfeiture. Because Takiff's "assignment" consisted of a SONAL check, however, his claim must fail for the same reasons as those of the other check holders.