**UNITED STATES of America**

v.

**U.S. CURRENCY TOTALLING $29,500.00.**

**Civ. No. 1:87–CV–969–ODE.**

United States District Court, N.D. Georgia, Atlanta Division.

Jan. 25, 1988.

Robert L. Barr, Jr., U.S. Atty., Albert L. Kemp, Jr., Asst. U.S. Atty. N.D.Ga., Atlanta, Ga., for plaintiff.

O. Jackson Cook, Brookins & Cook, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This forfeiture proceeding pursuant to 21 U.S.C. § 881(a)(6) is before the court for findings of fact and conclusions of law following a non jury trial on January 21–22, 1988. The currency in question was seized from Mark Eugene Bowers on August 19, 1986, as he was seeking to board a flight to Ft. Lauderdale, Florida. Mr. Bowers, who has not been charged with a drug violation in connection with conduct related to the currency, has filed a claim to the funds. Therefore, the issue before the court is whether the money should be forfeited to the government or returned to Mr. Bowers.

The evidence shows that at about 12:30 a.m. on the morning of August 19, 1986, Mr. Bowers made an airline reservation for a trip from his home in Indianapolis, Indiana to Ft. Lauderdale, Florida. He made the reservation under the name Robert Hall, and gave no telephone number where he could be contacted in Indianapolis. He was taken to the airport later in the day by Ms. Lenny Smoot, with whom he was living. He paid for the ticket with cash on arrival at the airport.

Within a few minutes of time when the airline reservation was made for Robert Hall, a reservation from Indianapolis to Ft. Lauderdale was also made on the same plane for a Mary Lash. Mr. Bowers purchased Ms. Lash's ticket with cash at the airport also; she flew on the leg of the trip from Indianapolis to Atlanta seated separately from Mr. Bowers, a/k/a Robert Hall. Neither Mr. Bowers nor Ms. Lash checked any luggage.

When Mr. Bowers and Ms. Lash approached the Delta gate at the Atlanta airport to check in for the flight to Ft. Lauderdale, DEA agent Paul Markonni was standing by the check-in counter. He heard Mr. Bowers/Hall inquire whether he and Ms. Lash could sit together on the Atlanta–Ft. Lauderdale flight. He observed there were no baggage claim checks on the tickets. He determined that the tickets had been purchased with cash at the Indianapolis airport. He observed that Mr. Bowers/Hall had a tote bag in his hand.

Agent Markonni then approached Mr. Bowers and after identifying himself as a DEA agent, asked if he would mind showing him his ticket. Once he did, Agent Markonni asked him if he was Robert Hall, and Mr. Bowers said he was. Bowers replied to Markonni's question whether the trip was for business or pleasure that it was a pleasure trip. Markonni then asked him if he would produce his driver's license. Bowers said he would; Markonni noticed Bowers' hands were shaking. When the license was produced, it reflected the name Mark Eugene Bowers. At this point Markonni indicated that he would like to search Bowers' bag; he read to Bowers from a DEA card explaining the right to refuse the search. Bowers said that this would be all right and in response to Markonni's inquiry, he said he would prefer that the search be done in a more private area.

After the two had arrived at a separate room beside the concourse, Markonni opened the bag and found a large amount of cash, which later was determined to be $29,500. At that point, Bowers stated in response to Markonni's inquiry concerning the money that it was going to be used to purchase two trailers for Bowers' trucking business in Indianapolis. Markonni reminded Bowers he had earlier said this was a pleasure trip and Bowers then stated it was both pleasure and business.

At that point, Markonni placed Bowers under arrest for giving a false name to a law enforcement officer. He handcuffed Bowers and took him to a DEA office off the concourse. At the office, Bowers was asked for the details of his business mission, *i.e.,* exactly where he was going and who he would see regarding the trucks. Bowers stated that he did not have the information with him and could not recall the exact details; he would have to obtain that information from his office. At that point, Markonni suggested that he could make a telephone call to his office to get that information so the bonafides of the business aspect of the trip could be verified. Bowers picked up the phone and dialed a couple of numbers, but there was no answer. Bowers was searched by Markonni, who recovered various papers with names, addresses and/or phone numbers. There was no piece of paper identifying a truck dealer or salesman in the Miami area, or any paper with information about two trailers.

A computer check by Markonni then indicated that Bowers had two convictions pertaining to distribution of talwin, a heroin derivative, in 1970 and 1977. The computer further indicated that Bowers currently was under investigation in Indianapolis for suspected cocaine dealing.

Mr. Bowers pled guilty to the charge of giving a false name to a police officer in the Superior Court of Clayton County and received a probated sentence pursuant to a negotiated plea agreement. As previously stated, he has not been charged with any drug violation growing out of or pertaining to the events on or about August 19, 1986, when he was stopped at the Atlanta airport.

At trial a law enforcement officer from Indianapolis testified that he knows of information from a number of reliable informants to the effect that Mr. Bowers currently is dealing in cocaine. He also testified that a reliable informant told him a few days after the airport arrest that Bowers' trip to Ft. Lauderdale had been for the purpose of buying a kilogram of cocaine.

Mr. Bowers appeared and testified at the instant civil proceeding. He called as his only other witness Harold Strange, a former employee, who testified concerning discussions Strange claimed he had had with Fruehauf, a trucking company, concerning the possibility of purchasing some used refrigerated trailers in the Miami area.

Mr. Bowers testified that in 1986, he had several business endeavors which were conducted under the aegis of Superior Holding and Development Corporation, a holding company. This included a trucking business, a construction business, and a grocery store. The business was conducted out of an office at the rear of the grocery store. Mr. Bowers also draws disability compensation. The court finds Mr. Bowers in fact did have an interest of some type in the trucking and grocery businesses, and that in some respect he was also engaged in construction work.

Mr. Bowers testified that on the day he left Indianapolis en route to Ft. Lauderdale, he took the currency out of a safe in his office. He stated that the majority of the funds represented profits from a construction job which the customer had paid in cash, plus cash that had been withdrawn over time from the corporation's bank account and placed in the safe. Mr. Bowers produced copies of the 1985 and 1986 federal income tax returns filed for Superior Holding and Development Corporation. The return states on its face that it was prepared by Milton D. Manual, who was identified by Mr. Bowers as an accountant. The return for calendar year 1986 was filed on December 9, 1987. It reflects that no salaries or wages were paid to anyone by the corporation during 1986. Mr. Bowers

testified he had never received a salary from the corporation. The return reflects no taxable income for 1986, but if the depreciation claimed is added back, the taxable income would be between $23,000 and $24,000.[1] For calendar year 1985, the stated taxable income plus claimed depreciation was about $7,500.

Mr. Bowers stated that in August, 1986, he had decided to purchase two used refrigerated trailers for his trucking business. He had asked Harold Strange, his dispatcher, to look into possible trailer purchases for him. Mr. Strange testified that he had called a salesman with a Fruehauf dealership in Indianapolis to discuss this with him. He testified he only knew the person as "Jack." Mr. Bowers and Mr. Strange testified they considered buying trailers in Indianapolis, but they found that the used trailers available there were corroded on the bottom due to the extensive use of salt on the roads in the winter time. Strange said that "Jack" had suggested that they call the Fruehauf dealership in Miami; the trailers available there would be better as they would have been driven in the southeast where salt on the roads is not a problem. Mr. Strange testified he did call Fruehauf in Miami, and spoke with a Marcas Garcia, who said he had two used refrigerated trailers for sale. Strange testified he wrote down Garcia's name and phone number and the business address of the Fruehauf dealership, plus details concerning the two available trailers, on a piece of paper. He testified he gave this to Mr. Bowers before his trip to Ft. Lauderdale. Mr. Strange identified the slip of paper, which has been admitted into evidence as Defendant's Exhibit 10. Mr. Bowers likewise identified the exhibit as being a note given to him by Mr. Strange before he left Indianapolis. Mr. Bowers testified that he had the note on his person when he was stopped by Agent Markonni in the Atlanta airport. In contradiction to Markonni's testimony, Mr. Bowers said he showed the note to Markonni. The court finds Mr. Markonni's testimony on that point credible

and Mr. Bowers' testimony not credible. Mr. Markonni's testimony is buttressed by the fact that, as might be expected, Mr. Bowers was searched after he was arrested; the agents took and photocopied various items which contained names, addresses and telephone numbers. Defendant's Exhibit 10 was not among them.

Mr. Bowers' explanation for the use of the name "Robert Hall" on his airline ticket was that he did not want Ms. Smoot, with whom he was living, to realize that he was going on a trip with another woman. This explanation, while reasonable at first blush, does not make sense when examined in relation to the particular circumstances of the plane trip. The tickets were purchased at the airport, not in advance. No telephone callback number to the Bowers/Smoot residence was provided. Ms. Smoot took Mr. Bowers to the airport, so she knew he was going on a plane trip. If Ms. Smoot had run into Ms. Lash at the airport, having the plane ticket under the name Robert Hall would not have aided Mr. Bowers in deceiving Smoot concerning his travel arrangements. In short, the use of a false name has not been logically explained.

Neither Ms. Smoot, Ms. Lash, any present or former employees of Fruehauf, nor Mr. Bowers' accountant appeared at trial. No explanation was offered for their absence.

Title 21, § 881(a) provides in pertinent part as follows:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

\* \* \* \* \* \*

(6) All moneys ... furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter ... and all moneys ... used or intended to be used to facilitate any violation of this subchapter.

---

1. This evidence, if taken at face value, raises the question whether the corporation is the proper claimant instead of Mr. Bowers.

The government bears the burden in a civil forfeiture action to demonstrate the existence of "probable cause for a belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute"; in this case, the exchange of a controlled substance. *United States v. Four Million, Two Hundred Fifty-Five Thousand*, 762 F.2d 895, 903 (11th Cir.1985); *United States v. $364,960.00 in United States Currency*, 661 F.2d 319, 323 (5th Cir., Unit B, 1981). "Probable cause" means reasonable grounds for belief of guilt supported by less than prima facie proof but more than mere suspicion. *United States v. Four Million, Two Hundred Fifty-Five Thousand, supra*, 762 F.2d at 903. Circumstantial evidence and inferences therefrom can suffice to support a finding of probable cause. *Id.* at 904; *United States v. $364,960.00 in United States Currency, supra*, 661 F.2d at 324–25. The government need not produce evidence of a particular narcotics transaction to establish probable cause. *United States v. Four Million, Two Hundred Fifty-Five Thousand, supra*, 762 F.2d at 904.

If the government meets the burden of showing probable cause, the burden shifts to the claimant to rebut the government's evidence and to show that the money seized was not derived from or intended to be used to facilitate a narcotics transaction. *United States v. Four Million, Two Hundred Fifty-Five Thousand, supra*, 762 F.2d at 904; *United States v. Little Al*, 712 F.2d 133, 136 (5th Cir.1983). The standard to be met by the claimant is a preponderance of the evidence standard. *United States v. One 56–Foot Yacht Named Tahuna*, 702 F.2d 1276, 1281 (9th Cir.1983).

In the instant case, the evidence meets the government's required showing of probable cause. The unexplained use of a false name, the misleading information given to Agent Markonni, the failure to know any specifics as to the business aspect of the trip, Mr. Bowers' prior drug convictions, the admittedly hearsay information concerning Mr. Bowers' current dealings in cocaine, and the handcarrying of such a large amount of cash on an airplane trip to Ft. Lauderdale, located in a known entry area for cocaine, together are reasonable grounds for a belief that Mr. Bowers was embarked on a trip to purchase illegal drugs, probably cocaine.

Mr. Bowers seeks to carry his burden by proving first that the funds came from a legitimate source, namely, that they were funds belonging to or emanating from his corporation (as opposed to being money received from a third party source), and then by the oral testimony of himself and Mr. Strange that his company was in the market for new trailers, and that Strange had had discussions with representatives of Fruehauf concerning the purchase of such trailers at a location in Miami.

The evidence presented by Mr. Bowers seeking to show that the funds came from Superior Holding and Development Corporation is insubstantial. It only consists of Mr. Bowers' oral testimony, and his testimony in other respects has already been discredited. Furthermore, it is clear that if the testimony as to the source of the money is true, it could be verified by objective independent evidence. Bank statements or copies thereof could have been tendered reflecting deposits and withdrawals; oral testimony from the customer who paid for the job in cash could have been obtained. Superior's 1985–86 tax returns suggest no more than the possibility that Superior was the source of the money, as the returns fail to reflect that Superior was a very profitable concern, and do not reflect payments to Bowers. The evidence as thus described leaves the court with the impression that there is a possibility, but not a probability, that the funds came from work done by Superior and/or from Superior's cash on hand.

Mr. Bowers' evidence seeking to show that the trip to Ft. Lauderdale was for a bonafide business purpose, namely, to purchase two used refrigerated trailers is unconvincing for a number of reasons. The idea that an individual in the trucking business in Indianapolis would fly to Ft. Lauderdale to purchase used trailers, while not totally implausible, seems odd. Handcarrying $29,500 in cash on an airplane to effect

an ordinary commercial transaction, while certainly possible, is unusual. The use of a false name gives the trip a clandestine appearance. The fact that Mr. Bowers told Agent Markonni he did not know the address or the name of the person he was going to see about the trailers is also suspicious. Mr. Strange is elderly, has limited faculties and is obviously loyal to Mr. Bowers. Clearly, testimony from the Fruehauf representative in Indianapolis, or the representative in Miami, would have been highly material in verifying Mr. Bowers' and Mr. Strange's otherwise unverifiable accounts. The court finds that the testimony of Mr. Bowers and Mr. Strange, which has not been supported by independent evidence which should be available if their statements are true, is insufficient to show the court that more likely than not the $29,500 in currency was intended for a legitimate transaction.

Accordingly, the subject United States currency totalling $29,500.00 is hereby ORDERED forfeited to the United States; the claim of Mark Eugene Bowers is hereby BARRED.