606 So.2d 750 (1992)
DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, Appellant,
v.
Bradley CHARLES and Lonnie Kerr, Appellees.
No. 92-264.
District Court of Appeal of Florida, Fifth District.
October 23, 1992.
*751 Enoch J. Whitney, Gen. Counsel, and R.W. Evans, Asst. Gen. Counsel, Dept. of Highway Safety and Motor Vehicles, Tallahassee, for appellant.
Michael H. Lambert, Daytona Beach, for appellees.
W. SHARP, Judge.
The Department of Highway Safety & Motor Vehicles appeals from an order entered after an adversary preliminary hearing which found the Department failed to adduce sufficient evidence to prove probable cause that $39,390 in United States currency was intended to be used to buy contraband. It also dismissed the Department's petition for a rule to show cause and for a final judgment of forfeiture, which the Department had filed to commence these proceedings. We think the Department adequately showed probable cause and its petition, which tracked the proofs offered at the hearing, justified the court's issuing a rule to show cause. Accordingly we reverse the order, which required the Department to turn the currency over to Kerr ($3,460) and to Charles ($35,930).
These proceedings were brought by the Department against the currency pursuant to section 932.701-704, Florida Statutes (1991), the Florida Forfeiture Statute, which empowers the state to seize and forfeit property under various circumstances described in the statute, and specifically in this case, currency which has been or is intended to be used in violation of any provision of Chapter 893 (Drug Abuse Prevention and Control). The Forfeiture Statute leaves much to the judicial imagination in guaranteeing procedural due process to individuals whose property is being forfeited. As Judge Waldon described them, in In re U.S. Currency in Amount of $5,300.00, 429 So.2d 800 (Fla. 4th DCA 1983), these forfeiture proceedings were a "procedural quagmire."
However, in the Florida Supreme Court's recent opinion, Department of Law Enforcement v. Real Property, 588 So.2d 957 (Fla. 1991), the court created a procedural framework for the statute which allowed it to pass constitutional muster. That opinion also provides the procedural context in which this case must be decided.
This cause had progressed against the $39,390 to the point of holding a preliminary adversary hearing to determine whether or not there was sufficient evidence to show probable cause the currency was in route to be used to buy drugs or contraband.[1] At a later hearing or jury trial, the Department would have to prove by clear and convincing evidence the currency was intended to be used for such a purpose.[2] If the Department carried its probable cause burden at this preliminary hearing, it is entitled to retain the currency "by the least restrictive means necessary pending the final hearing."[3] If the Department failed to establish probable cause, the currency should be turned over to the claimants.
*752 At the preliminary hearing, two state troopers, Caves and Ellis, who were involved in the initial seizure of the currency, testified at length. The claimants did not controvert their testimony nor offer any conflicting evidence. Only Charles gave any testimony, relating to his ownership of the largest portion of the cash. Kerr did not appear.
At close to noon time, Caves was patrolling I-95 in Volusia County, Florida, heading south. He saw a small blue Chevy pickup truck suddenly change from the fast to the slow lane, without signaling. The move required a Cadillac in the slow lane to slam on its brakes, in order to avoid colliding with the pickup. Caves thought the driver of the pickup may have changed lanes abruptly because he saw Caves' police car overtaking him from the rear.
Caves pulled the pickup over and planned to give the driver a "warning" for improper lane change. Kerr was the driver. He got out of the pickup to talk to Caves. Caves checked Kerr's license and asked to see the pickup's registration.
Kerr explained that the owner of the pickup, Altizer, was one of the passengers in the cab. He, Altizer, and a third man, Flemming, were driving from Kentucky to Fort Lauderdale. Caves walked to the passenger side of the pickup to talk with Altizer.
When Altizer rolled down the window, Caves detected a strong odor of marijuana coming from the cab. Caves asked the three men if there were any drugs or contraband in the pickup. They said "no." Caves asked Altizer and Fleming to get out of the pickup, and Altizer agreed Caves could search it.
In the cab, Caves saw marijuana seeds and debris along the back of the seat. He also found a vial of Valium pills in the pocket of Kerr's coat. They were prescribed for a "Gary Wulford." Kerr said he had no idea how the pills got into his coat pocket.
With Altizer's renewed consent, Caves searched the back of the pickup. Kerr assisted by opening the tailgate and pulling back a tarpaulin, which covered pieces of luggage. He removed the luggage so Caves could search it, and returned the tarpaulin to its original position. Caves testified he thought Kerr appeared to be trying to hide something under the tarpaulin. However, he did not put that statement in his report, prepared the following day.
When Caves lifted the tarpaulin, he saw an orange, metal ammunition can, similar to those used by the military. When he opened it, he saw it was full of currency. The bills were stacked in bundles and secured by different colored rubber bands. In the can he also found a baggie which contained a small amount of marijuana (six and one-half grams).
At this point, Caves became concerned for his own safety. He patted down the three men for weapons. In Kerr's pants pocket, he saw a bulge. It proved to be a baggie which contained a wad of currency ($3,460). All three men denied any knowledge of how the metal can got into the truck and disclaimed any ownership of it or its contents.
Caves brought his K-9 drug-trained dog from his vehicle. The dog alerted on the car seat in the cab. It also alerted on the metal can. It later alerted on Kerr's baggie which contained $3,460. Trooper Ellis, who arrived to back up Caves, put Kerr's cash into a fresh bag and two "clean" objects in two other fresh bags. The dog alerted only on the bag containing the $3,460.
Based on their law enforcement training and experience in contraband cases, Caves and Ellis testified they thought the currency was in route to Miami (or its environs) to be used to purchase drugs or other contraband.[4] They based this on the direction of the pickup truck's travel, the *753 amount of cash and the manner in which it was packed and bundled. Both said it was consistent with how drug dealers carry currency to make drug deals.
When there is more than one "player," Caves explained, different colored bands are used to separate each person's stash. However, neither Ellis or Caves could identify a specific meaning for the colored bands used on this currency. A later examination showed the money in the can was in four large bundles, with approximately $10,000 in three and $6,000 in the fourth. Each bundle was broken up into $1,000 increments.
Caves testified he surmised the $3,460 in Kerr's baggie had come from the $6,000 bundle in the can. Some money had been spent on travel from Kentucky, so the fourth bundle in the can commenced the journey as approximately equal to the other bundles  close to $10,000.
Caves gave as an additional reason for this belief the fact that his dog alerted on Kerr's currency. Had it been in the metal can with other currency, it would have been suffused with the odor of marijuana, in the can. Also, Caves testified that carrying large wads of cash in a plastic baggy is typical of drug dealers. They think police dogs cannot smell the drug odors on the bills through the plastic. That belief is erroneous, Caves said.
At roadside, Caves checked on the three men's criminal records. He received a report that two of them had prior drug-crime records. Kerr then offered a belated and somewhat different explanation of how the Valium got into his pocket. Caves placed the currency in the trunk of his car and asked the men to follow him to the police station.
Criminal proceedings were later brought against Kerr for possession of Valium. His explanation was never able to be substantiated. The Department sought forfeiture of the currency. Kerr and Charles opposed it.
Charles is the brother of a good friend of Altizer's. He lives in Kentucky, as do the others. He gave a most extraordinary explanation of how the currency arrived in the pickup. He had saved money his whole lifetime, having started work at eleven years of age. He hid his earnings in the metal can, and never told his wife about it. It totalled $38,000.
He wanted quick access to the money, so did not use a bank, although he had bank accounts. He used it to buy things and gamble on horses. He did not want to account to his wife for what he did with his money. He was also planning to surprise her by buying her a farm with the monies, from his brother, Altizer's friend.
One day he got into a bad argument with his wife. He decided to leave and take his money with him, although his wife did not know of its existence or its hiding place. He went to his brother's house. There, he saw Altizer's pickup parked outside. He thought the truck would be a good hiding place, so he put the metal can with his $38,000 cash in the back, under a tarpaulin.
Then he went out, got drunk, and had a good time. The next day he went back to his brother's house to get his money, but found Altizer's truck was gone. He next learned where the pickup was when Altizer called Charles' brother from Florida, shortly after being arrested.
Some two weeks later, Charles and Altizer went to Tallahassee to claim the currency. He could not recall at the hearing with whom he talked or to what office he went. He had no records to corroborate the fact that the currency was earned by him and he admitted on cross-examination that his own income tax records clearly show it would be very difficult for him to save $38,000 in cash from his earnings or income.
In this proceeding, the Department had to establish probable cause to believe that the currency in the metal can and in Kerr's baggie was in route to Miami, or other points in South Florida, to be used in purchasing contraband. Probable cause in this context means less than a prima facie *754 case, but more than a mere suspicion.[5] The state agency (here, the Department) may make such a showing based on circumstantial evidence and the totality of the circumstances.[6] It is also entitled to rely on the training and experience of the police officers involved in the seizure, and the reasonable inferences they drew from the factual situation in which the currency was found.[7]
In our view, the Department carried this initial burden. A case factually similar to this one is Lobo v. Metro-Dade Police Department, 505 So.2d 621 (Fla. 3d DCA 1987), in which the Third District affirmed a final order of forfeiture. Although not required in every probable cause showing, in this case, as well as in Lobo, the following facts and circumstances were established:
1. in connection with a consensual search of a vehicle, the police found an unusually large amount of currency being transported in a bag or other container, which in the common course of normal, contemporary behavior is peculiar or remarkable;
2. the currency was packaged in such a manner or carried (as in Kerr's baggie) to suggest to knowledgeable police officers, a pattern unique to drug or contraband dealers;
3. a trained dog alerted on both Kerr's wad of bills, as well as on the metal container which held most of the currency;
4. the occupant(s) of the vehicle were unable to give any reasonable explanation as to why the large amount of bills were in the vehicle and packaged in a manner similar to the way drug dealers carry their cash to do deals;
5. an occupant of the vehicle appeared to the officer to change his "story" and to be hiding something.
In addition to these facts and circumstances present in Lobo, in this case there was more:
1) two of the occupants of the car had criminal records in drug crimes;
2) contraband (although a small amount) was found in the cab, in Kerr's jacket, and in the metal can where the large stash of cash was located. Such similar additional facts and circumstances were relied upon by the First District in In re Forfeiture of $62,200 In U.S. Currency, 531 So.2d 352 (Fla. 1st DCA 1988) in affirming a probable cause finding. See also Wildwood Police Department v. Wyatt, 588 So.2d 59 (Fla. 5th DCA 1991).
At the hearing below, the trial judge expressed concern about possible violation of Kerr's and Charles' due process rights because the actual currency seized had been deposited into a bank account (within a few days of its seizure) and could not be tested to see if it (in fact) bore the scent of contraband. The currency in the metal container was never separately alerted on by the drug dog, nor was the wad of bills in Kerr's baggie tested separately from the baggie, although that fact is not clear form Trooper Ellis' testimony. These complaints form the basis for Kerr's and Charles' motions to dismiss.
In this case, we do not think the failure (if it was one) of the Department to keep the exact bills seized in its safe so they could later be tested by the claimants, deprived them of due process. Trooper Caves testified that currency which is kept in a container with contraband will absorb its scent. Thus, the bills in the metal container, if tested separately, would clearly have caused the dog to alert because they had been packaged with marijuana and there was no point in testing them separately. Further, it is not clear from a *755 reading of Trooper Ellis' testimony that the bills in the baggie were not tested separately from the baggie.
Caves testified that the odor of contraband on currency dissipates over a relatively short time period. Once the scent is lost, no drug dog would alert on the currency. Thus, there was no practical reason to keep the actual bills on hand for testing. Further, no claimant sought or asked for independent testing until six to seven months after the seizure. Any such tests would then be meaningless.
The testing issue in this case simply does not rise to the level of the problems involved in Lancaster v. State, 457 So.2d 506 (Fla. 4th DCA 1984), rev. denied, 467 So.2d 1000 (Fla. 1985); State v. Ritter, 448 So.2d 512 (Fla. 5th DCA 1984); and Stipp v. State, 371 So.2d 712 (Fla. 4th DCA 1979), cert. denied, 383 So.2d 1203 (Fla. 1980). In those cases, crucial evidence necessary to prove or disprove the commission of a crime was inadvertently lost by the state. As a result an expert witness was not allowed to testify for the state in order to establish an essential proof. But, in this case, no "evidence" was destroyed or lost to the claimants. Had the Department still had the same bills it seized in its evidence locker, they would not benefit the claimant now. The issue is not whether a drug dog would (at a later time) alert on the currency. The important fact in this case was that the dog did alert under Trooper Cave's command, under the established circumstances.[8] The claimants were free to cross-examine him as to his or his dog's abilities.
Some of the older cases provide that once the state establishes probable cause, the claimants then have the burden to show the forfeiture is improper for whatever reason. See In re Approximately $48,900 Dollars in U.S. Currency, 432 So.2d 1382 (Fla. 4th DCA 1983). If the claimant fails to do so, then an order of forfeiture will be affirmed. See Lobo. However, it appears Department of Law Enforcement, now requires an additional formal trial where the state agency must prove grounds for forfeiture by clear and convincing evidence. These proceedings have not yet reached that point.
Had the claimants been required to go forward at this preliminary hearing with any burden of proof, they would clearly have failed. Kerr did not appear. And, no testimony was offered on his behalf as to his legitimate ownership of the $3,460 or its intended legitimate use. Charles' testimony reads as inherently incredible, but that determination is one for the trial judge or jury in a subsequent proceeding.
REVERSED and REMANDED.
GOSHORN, C.J., and GRIDLEY, W.C., Associate Judge, concur.
NOTES
[1] Department of Law Enforcement v. Real Property, 588 So.2d 957, 965 (Fla. 1991).
[2] Id. at 967.
[3] Id. at 966.
[4] Regrettably, Miami, Florida, has achieved a degree of notoriety for being a center for drug smuggling and source of supply. United States v. Four Million Two Hundred Fifty-Five Thousand Dollars, 762 F.2d 895 (11th Cir.1985), cert. denied, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986).
[5] In re Forfeiture of $62,200 in U.S. Currency, 531 So.2d 352 (Fla. 1st DCA 1988); Lobo v. Metro-Dade Police Department, 505 So.2d 621 (Fla. 3d DCA 1987).
[6] Bradenton City Police Department v. $13,895 in U.S. Currency, 535 So.2d 326 (Fla. 2d DCA 1988); Lobo v. Metro-Dade Police Department, 505 So.2d 621 (Fla. 3d DCA 1987).
[7] Stanley v. State, 559 So.2d 460 (Fla. 4th DCA 1990); Bradenton City Police Department v. $13,895 in U.S. Currency, 535 So.2d 326 (Fla. 2d DCA 1988); In re Forfeiture of $62,200 in U.S. Currency, 531 So.2d 352 (Fla. 1st DCA 1988); Lobo v. Metro-Dade Police Department, 505 So.2d 621 (Fla. 3d DCA 1987); State v. Spence, 448 So.2d 599 (Fla. 2d DCA 1984).
[8] See United States v. $13,715 in U.S. Currency, 736 F. Supp. 135 (E.D.Mich. 1990).