UNITED STATES of America

v.

PREMISES KNOWN AS 2639 MEETING-HOUSE ROAD, JAMISON, PENNSYLVANIA, a Parcel of Real Property and All Appurtenances Thereto, Lying in Bucks County, Pennsylvania, and Containing 5 Acres, More or Less; Premises and Business Known as McNally's 355 York Road, Warminster, Pennsylvania, a Parcel of Real Property and All Appurtenances Thereto, All Furnishings and Contents Therein, Including Liquor License No. R18284; Liquor License No. R19229 Owned by Jamill Inc. t/a Spanky's; and Liquor License No. TR19233 Owned by Abbey's Bar, Inc. t/a Warminster Abbey; and Any and All Proceeds From the Sale of Said Properties.

Robert F. SEBZDA, individually and as Secretary of Jamill, Inc., Abby's Bar, Inc., and Glemic, Inc., George M. Leiby, individually and as President of Jamill, Inc., Abby's Bar, Inc., and Glemic, Inc. Glenn R. Leiby, individually and as Treasurer of Jamill, Inc., Abby's Bar, Inc., and Glemic, Inc. Jamill, Inc., Abby's Bar, Inc. Glemic, Inc.

v.

Francis MULLEN, Administrator, United States Drug Enforcement Administration, Norton J. Wilder, Special Agent in Charge, United States Drug Enforcement Administration, Edward S.G. Dennis, United States Attorney.

Civ. A. Nos. 83–1829, 83–3266.

United States District Court, E.D. Pennsylvania.

April 4, 1986.

James C. Sheehan, Serena H. Dobson, Asst. U.S. Attys., Philadelphia, Pa., for the U.S.

C. McCarthy, Bensalem, Pa., for Premises Known as 2639 et al.

John R. Crayton, McCarthy and Crayton, Bensalem, Pa., for Glenn Leiby, Glemic, Inc., Robert F. Sebzda, claimants.

Gregory J. McCarthy, John R. Crayton, Bensalem, Pa., by Brenda M. Nelson, Philadelphia, Pa., amicus curiae ACLU.

Alexander Ewing, Jr., Serena H. Dobson, Asst. U.S. Attys., Philadelphia, Pa., for Francis Mullen, Norton J. Wilder, Edward S.G. Dennis.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

This is an action *in rem* by the United States to forfeit certain business and real property alleged to have been acquired with the proceeds of illegal drug transactions and therefore subject to forfeiture under the provisions of 21 U.S.C. § 881(a)(6). The properties were originally seized pursuant to a warrant issued by a United States Magistrate on April 19, 1983. On June 8, 1983, the warrant of seizure was quashed for lack of probable cause and return of the property seized was ordered. (Reconsideration denied September 16, 1983). The matter then proceeded on the Government's civil complaint in forfeiture, filed simultaneously with the attempted seizure on April 19, 1983, in accordance with the Supplemental Rules for Certain Admiralty and Maritime Claims (Rule E).

The properties the subject of the complaint in forfeiture are:

1. Premises known as 2639 Meetinghouse Road, Jamison, Pennsylvania.

2. Liquor License No. R–19233 owned by Abby's Bar, Inc.

3. Liquor License No. R–19229 owned by Jamill, Inc.

4. Premises and Business known as McNally's.

The claimants are Robert Sebzda, Glenn Leiby and George Leiby; subsequent to the complaint in forfeiture, Robert Sebzda and Glenn Leiby were indicted for violation of 21 U.S.C. §§ 841, 846 and 848. Robert Sebzda was also indicted for violation of 26 U.S.C. §§ 7203 and 7206(1).[1] On January 18, 1984, claimants Robert Sebzda and Glenn Leiby entered pleas of guilty to

---

1. On July 8, 1983, the claimants filed Civil Action No. 83–3266 seeking a declaratory judgment that their properties were seized by the United States on April 19, 1983 in violation of the United States Constitution and an order restraining the government from enforcing 21 U.S.C. § 881(a)(6) with respect to the forfeiture of proceeds traceable to an unlawful exchange; no monetary damages were sought. This action was stayed and placed in suspense on December 5, 1983 pending the outcome of the criminal case. On February 7, 1984, Civil Action No. 83–3266 was removed from suspense and consolidated with Civil Action No. 83–1829. The discussion in this opinion covers all issues raised in both cases; they are disposed of by separate orders this day.

Count 1 (conspiracy to manufacture and distribute methamphetamine); Glenn Leiby also entered a plea of guilty to Count 6 (unlawful manufacture of methamphetamine) and Robert Sebzda entered pleas of guilty to Count 8 (continuing criminal enterprise) and Count 11 (making false statement on an income tax return). Robert Sebzda and Glenn Leiby were sentenced on their pleas of guilty and are currently incarcerated.

No criminal charges have been brought against George Leiby to date. By consent of all the individual claimants filed October 23, 1984, the claim of George Leiby to a one-third interest in three of the four defendant properties[2] was severed for this separate trial; the individual claimants also agreed to the determination of the constitutional issues at this trial.

### Findings of Fact

From January, 1978 to December, 1982, Robert Sebzda and Glenn Leiby admittedly manufactured and distributed methamphetamine in substantial quantities.

Robert Sebzda and Glenn Leiby admittedly invested in businesses, including bars known as Warminster Abbey, McNally's and Spanky's, to hide proceeds earned from the manufacture and distribution of methamphetamine. There is no substantial evidence that George Leiby was involved in that manufacture or distribution of methamphetamine.

George Leiby was President and bookkeeper of each of the three corporations and spent a substantial amount of time at Warminster Abbey, Spanky's and McNally's; claimant testified to working at each of the bars sometimes as many as eighty hours per week in addition to his full-time position as controller of another company. (Tr. 2.178–187).

Because of his official position, his demeanor, and the credibility of the evidence in its entirety, claimant George Leiby has not established that he did not know of the illegal drug transactions or of the investment of the proceeds of illegal drug transactions in those businesses.

Abby's Bar, Inc. was incorporated in June, 1980. Robert Sebzda, Glenn Leiby and George Leiby each held a one-third interest therein until January, 1984, when George Leiby acquired a two-thirds' interest and Bernard Sebzda a one-third interest.

Glenn Leiby, George Leiby and Robert Sebzda purchased the Warminster Abbey business and liquor license on April 28, 1980 from William H. McCreary. Shortly thereafter, Leiby, Leiby and Sebzda assigned their respective interests in Warminster Abbey to Abby's Bar, Inc.

Abby's Bar, Inc. acquired Warminster Abbey for $65,000, paid by a purchase money mortgage from the seller in the amount of $50,000 and $15,000 received from Penn Vending Company; there is no evidence or contention that either the mortgage money or the money received from Penn Vending Co. was the illicit proceeds of drug transactions.

The $65,000 purchase price included the business, liquor license, fixtures and equipment but only the liquor license is a subject of this action.

There is no evidence from which the actual cash value of the Abby's Bar, Inc. liquor license at time of purchase can be determined; the value on the books on August 31, 1980 and at all relevant times thereafter was $10,000 (Ex. G–15—G–21).

The Government has not established that the purchase price for Warminster Abbey was not $65,000 but approximately $115,000 because there was a $50,000 "under-the-table" cash payment.

The court does not find that drug proceeds were used to purchase Warminster Abbey or the liquor license that is the subject of this litigation. Robert Sebzda and Glenn Leiby admittedly invested drug proceeds in Warminster Abbey. But the

---

**2.** George Leiby claims no interest in the premises known as 2639 Meetinghouse Road, Jamison, Pennsylvania.

credible evidence of record establishes that drug proceeds were invested after the purchase of the business. This investment may have enhanced the value of the liquor license. The book value was not increased as a result of the investment of drug proceeds and there is no evidence from which the court can determine the actual cash value of the liquor license at the time this action was initiated (April, 1983).

Abby's Bar, Inc. had no legitimate income other than receipts from the operation of Warminster Abbey.

Jamill, Inc. was incorporated in November, 1980. Glenn Leiby, George Leiby and Robert Sebzda each held a one-third interest in the corporation until January, 1984 when George Leiby acquired a two-thirds' interest and Bernard Sebzda a one-third interest.

Robert Sebzda, George Leiby and Glenn Leiby purchased Spanky's business and liquor license from Ronray, Inc. on September 2, 1980 for $31,000. Shortly thereafter, Sebzda, Leiby and Leiby assigned their respective interests in Spanky's to Jamill, Inc.

The $31,000 purchase price included the business, liquor license, fixtures and equipment but only the liquor license is the subject of this action.

There is no evidence from which the actual cash value of the Jamill, Inc. liquor license at time of purchase can be determined; the value on the books at all relevant times was $10,000 (Ex. G–26, 12/31/80; G–27, 1/31/81).

To pay for Spanky's, $10,000 was borrowed from Robert Sebzda's father, Bernard Sebzda; there is no evidence that the $10,000 borrowed from Bernard Sebzda was drug proceeds. Ten Thousand Dollars was also borrowed from Abby's Bar, Inc.; it is more likely than not that this $10,000 borrowed from Abby's was received from exchanges for controlled substances because it cannot be accounted for by earnings (profits) from the bar's legitimate business operations or anything else. The remaining $11,000 was paid in cash: $5,000

as a deposit and $6,000 at settlement. It is more likely than not that this $11,000 was also cash received from exchanges of controlled substances for the same reason.

There is no evidence from which the actual cash value of the liquor license at the time this action was initiated can be determined (April, 1983). To the extent that drug money was used for business improvements or investment, there might have been a corresponding increase in the value of the liquor license. But the Government presented no evidence on the increase in value, if any, and traced no such increase to the investment of drug proceeds.

Jamill, Inc. had no legitimate income other than receipts from the operation of Spanky's.

Glemic, Inc. was incorporated in August, 1981. Robert Sebzda, Glenn Leiby and George Leiby each held a one-third interest in the corporation until January, 1984 when George Leiby acquired a two-thirds' interest and Bernard Sebzda a one-third interest.

Glenn Leiby, George Leiby and Robert Sebzda agreed to purchase the premises at which McNally's was operated from Marguerite Eliades on March 12, 1981 for $198,000. Shortly thereafter, Sebzda, Leiby and Leiby assigned their respective interests in McNally's to Glemic, Inc.

The $198,000 purchase price was paid by an $89,000 purchase money mortgage to Marguerite Eliades from Glemic, Inc., a $59,000 mortgage debt of Eliades to John McNally assumed by Glemic, Inc. and $50,000 paid in cash to the seller: $20,000 as a deposit and $30,000 at settlement. It is more likely than not that the $50,000 in cash was received from an exchange of controlled substances but there is no evidence or contention that the mortgages were connected with drug proceeds.

Improvements made to McNally's in the amount of $100,000 were financed by Acceptance Associates of America; there is no evidence or contention that the loan

proceeds were connected with drug proceeds.

McNally's was sold on February 10, 1984 for $535,000, $35,000 of which was allocated to the liquor license and amusement permits. By agreement of the parties approved by the court, the proceeds of the sale, less certain payments to trade creditors and $35,000 allocated to the licenses, were deposited with the court in an interest-bearing account pending the outcome of this litigation. The Government presented no evidence of the value of McNally's at the time it commenced this action.

Glemic, Inc. had no legitimate income other than receipts from the operation of McNally's.

Special Agent Vincent Crovetti of the Drug Enforcement Agency ("DEA") was assigned to investigate Robert Sebzda early in 1982. Crovetti had been employed by the DEA for approximately 13½ years, and was experienced in conducting investigations of alleged violations of narcotics laws.

In conducting his investigation of Sebzda, Crovetti consulted with DEA officials who had previously investigated Sebzda as well as local law enforcement officials (the Falls Township Police), who told Crovetti that Robert Sebzda and all three Leiby brothers—Glenn, Mark and George—were involved in the drug trade.

Crovetti also interviewed five cooperating witnesses: Zellman Fairorth, Gary Shatz, George Johnson, Carl Polchan, and John Paxson. None of the cooperating witnesses had personal knowledge of George Leiby's manufacture or distribution of methamphetamine or of the circumstances of claimant's acquisition of defendant properties but each had personal knowledge of the involvement of Robert Sebzda and Glenn Leiby in the drug trade. Polchan and Fairorth also told Crovetti that Robert Sebzda had admitted to them that he had invested proceeds from his drug trade in various bars. Polchan and Fairorth also told Crovetti that Robert Sebzda had not been legally employed for years and that

Sebzda's sole source of income was the drug trade.

Special Agent Robert Gudknecht of the Internal Revenue Service testified for the Government that after examining the corporate records of the three corporations and the claimant's tax return for 1981, he formed the opinion that Abby's Bar, Inc. had insufficient earnings from operations to have loaned Jamill, Inc. $10,000 for the acquisition of its liquor license and that George Leiby had insufficient income from his employment or any other legitimate source to have made the cash payments for the purchase of Spanky's and McNally's.

While the court finds Gudknecht personally credible as a witness, his testimony was beyond his area of expertise, the net expenditure method of accounting and indirect sources of income. Gudknecht was not qualified as an expert on tracing proceeds and differentiating between legitimate and illegitimate funds. In addition, his reliance in formulating his opinions on business records the Government contends are fictitious and false convinces the court that his evidence is of slight probative value.

### Discussion

I. *Probable Cause*

The Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, was amended in 1978 to permit civil forfeiture of proceeds traceable to sales or exchanges of controlled substances in violation of the Act. At the times here relevant, 21 U.S.C. § 881(a)(6) provided, in pertinent part: [3]

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

* * * * * *

(6) All moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, *all proceeds traceable to*

---

3. The statute was amended in 1984 by the Crime Control Act of 1984, Public Law 98–473.

*such an exchange . . . .* (emphasis supplied)

 Title 21 U.S.C. § 881(d) provides that the procedures governing forfeiture under the customs statutes are also applicable to § 881. The Government has the initial burden of showing that there was probable cause to initiate the forfeiture action—that is, probable cause to believe that a substantial connection existed between the property to be forfeited and the criminal activity defined by the statute, *i.e.,* the exchange of a controlled substance. 21 U.S.C. § 881(d), 19 U.S.C. § 1615; *United States v. $55,518.05 in U.S. Currency,* 728 F.2d 192, 195 (3d Cir.1984); *United States v. $64,000.00 in U.S. Currency,* 722 F.2d 239, 244 (5th Cir.1984). The test for determining the presence of probable cause for forfeiture is similar to that for arrests, searches and seizures: the Government must show a reasonable ground for belief that there was an unlawful exchange of controlled substances and, in the case of forfeiture of "proceeds," that there was a substantial connection between that exchange and the property so that the drug proceeds are traceable into the property. The belief must be more than mere suspicion but can be created by less than *prima facie* proof. *United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 119, 83 L.Ed.2d 61 (1985); *United States v. $64,000.00 in U.S. Currency, supra* at 244.

 Five cooperating witnesses were interviewed by the Government prior to institution of this action: Gary Shatz, Carl Polchan, Zellman Fairorth, George Johnson and John Paxson. Each had participated in drug exchanges with Sebzda and told Crovetti of his personal knowledge of the involvement of Robert Sebzda and Glenn Leiby in the drug trade.[4]

The involvement of Robert Sebzda and Glenn Leiby in the drug trade was confirmed by the Falls Township Police (Tr. 1.38) and a taped admission of Robert Sebzda. Special Agent Crovetti testified that he heard a taped conversation between Fairorth and Sebzda in which Sebzda boasted about his drug trafficking. (Tr. 1.19–20). The Government had probable cause to believe that Sebzda and Glenn Leiby acquired proceeds from drug exchanges.

Fairorth and Polchan told Crovetti that Sebzda had told them he was investing proceeds from his drug trade in various bars.[5] (Tr. 1.71–76 and Tr. 1.138–141). Crovetti reasonably believed that Fairorth's reliability had been proved in prior investigations leading to criminal convictions. (Tr. 1.135). Fairorth and Polchan also told Crovetti that Sebzda had not been legally employed for many years so that it was reasonable for Crovetti to believe that financial investments made by Sebzda involved drug proceeds. (Tr. 1.76 and 1.141–142).

Independent investigation by Crovetti revealed that Sebzda was the incorporator of three corporations—Abby's Bar, Inc., Jamill, Inc., and Glemic, Inc.—and that Sebzda and either Glenn or George Leiby were officers of these corporations. His investigation also revealed that these three corporations purchased or leased three bars: Warminster Abbey, Spanky's and McNally's. The Government had probable cause to believe that drug proceeds were invested in these businesses and the defendant properties. The Government, having established at trial probable cause to believe that Sebzda and Glenn Leiby were in the drug trade and that proceeds of said

---

4. Carl Polchan was employed by John Paxson as a cabinet maker at Knock On Wood, a home improvement store, from 1968 to 1979. Until 1977, Paxson supplied Polchan with methamphetamine, which Polchan used and sold with Sebzda. (Tr. 1.67–68). Gary Shatz, together with Dave and Diane Wilheim, purchased methamphetamine from Sebzda and Glenn Leiby and then resold it at a profit. (Tr. 1.119–120). Zellman Fairorth sold chemicals to Robert Sebzda and Glenn Leiby to use to manufacture methamphetamine. (Tr. 1.136). George Johnson purchased methamphetamine from Sebzda through Annamae Burkey. (Tr. 1.148–150).

5. Crovetti's Affidavit stated that Polchan specifically identified Warminster Abbey, Spanky's & McNally's.

trade were invested in defendant properties, met its burden of establishing probable cause to initiate this action.[6]

Claimant, George Leiby, argued at trial that while the Government may have established probable cause to believe that Glenn Leiby's and Robert Sebzda's interest in defendant properties were forfeitable, there was no probable cause as to his interest. But this is an action *in rem* not *in personam*. The defendants are the properties, not George Leiby. The Government need not establish that George Leiby dealt in drugs but only that the properties are corrupt to the extent they incorporate proceeds traceable to an exchange of controlled substances in violation of law. If the Government establishes a financial link between a defendant property and proceeds of an illegal drug exchange, it meets its burden as to that *res.*

The forfeiture provisions of 21 U.S.C. § 881(a)(6) expressly preserve the rights of an innocent owner. Were the probable cause requirement as claimant contends, it would not have been necessary for Congress to provide the innocent-owner defense expressly by statute. Claimant's argument ignores the nature of the action and is inconsistent with the statutory scheme.

■ Claimant also argued that the Government did not establish the specific drug transactions from which proceeds were invested in the defendant properties. But it is well established that the Government need not introduce evidence of particular drug transactions to meet the probable cause standard. *United States v. Four Million, Two Hundred Fifty-Five Thousand,* 762 F.2d 895, 904 (11th Cir.1985); *see also United States v. Thirteen Thousand Dollars in U.S. Currency,* 733 F.2d 581, 585 (8th Cir.1984); *United States v. Brock,* 747 F.2d 761, 762 (D.C.Cir.1984). It is sufficient that the Government had probable cause to believe that there were drug transactions in general and that proceeds from said transactions were invested in defendant properties.

## II. *Claimant's Burden*

■ The Government having established probable cause to believe drug proceeds were invested in the defendant properties, the burden of proof shifted to the claimant to show by a preponderance of the evidence that the property was not subject to forfeiture. 19 U.S.C. § 1615; 21 U.S.C. § 881(d); *United States v. $83,320.00 in Currency,* 682 F.2d 573, 577 (6th Cir.1982).

Glenn Leiby and Robert Sebzda were indicted subsequent to this complaint in forfeiture for violations of 21 U.S.C. §§ 881, 846 and 848. Robert Sebzda was also indicted for violations of 26 U.S.C. §§ 7203 and 7206(1). On January 18, 1984, Robert Sebzda and Glenn Leiby entered pleas of guilty to Count I (conspiracy to manufacture and distribute methamphetamine); Glenn Leiby also entered a plea of guilty to Count 6 (unlawful manufacture of methamphetamine) and Robert Sebzda entered a plea of guilty to Count 8 (continuing criminal enterprise) and Count 11 (making false statement on an income tax return). Count 1 of the indictment, to which both Sebzda and Glenn Leiby entered pleas of guilty, states, in pertinent part:

> It was a further part of the plan and purpose of the conspiracy that defendant ROBERT SEBZDA a/k/a "Bobby"; and GLENN LEIBY would and did invest proceeds earned from the manufacture and distribution of methamphetamine in various businesses, including bars known as Spanky's, Warminster Abbey and McNally's, in order to hide such proceeds

**6.** The original warrant of seizure obtained by the Government was quashed by this court because of the Government's failure to establish probable cause. The Crovetti affidavit in support of the seizure made no mention of: 1) Sebzda's taped admission of his deep involvement in the drug trade; 2) confirmation by the Falls Township Police of such involvement; and 3) Fairorth's corroboration of Polchan's contention that Sebzda had not been legally employed since 1978. At trial, proceeding on a complaint in forfeiture, the Government introduced evidence that it did not offer to the court when it ruled on the propriety of the Magistrate's warrant for seizure. This additional evidence establishes probable cause on the record.

from detection and to offer a legitimate explanation for those defendants' otherwise illicit sources of income.

The pleas of guilty were accepted only after Assistant United States Attorney Rosenberg had made specific reference to paragraph 12 of Count 1 of the superseding indictment; both Glenn Leiby and Robert Sebzda stated that they knew what they had agreed to and they were knowingly and voluntarily pleading guilty. The guilty pleas constituted admissions of claimants Robert Sebzda and Glenn Leiby that drug proceeds were invested in defendant properties.

But the legislative history of 21 U.S.C. § 881(a)(6) makes clear that property is subject to forfeiture only to the extent it does in fact constitute drug proceeds; *i.e.*, whatever the form of the property, it is forfeitable only to the extent that the property itself has a traceable connection to drug transactions. The guilty pleas do not preclude this claimant from establishing that legitimate assets were also invested in the defendant properties. If legitimate assets are commingled with drug proceeds, only the drug proceeds, whatever their form, are subject to forfeiture:

> Due to the penal nature of forfeiture statutes, it is the intent of these provisions that property would be forfeited only if there is a substantial connection between the property and the underlying criminal activity which the statute seeks to prevent. Specifically, the Senate amendment provides for the forfeiture of property exchanged or intended to be exchanged in an illegal drug transaction. In addition it provides for forfeiture of property which is the proceeds of an illegal drug transaction only if there is a traceable connection between such property and the illegal exchange of controlled substances. *Thus if such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, but only to the extent that it could be shown that a traceable connection to an illegal*

*transaction in controlled substances existed.* (Emphasis supplied).

7 United States Code Congressional and Administrative News 9522 (1978). Claimant is entitled to his interest in defendant properties to the extent he can prove by a preponderance of the evidence they were not purchased with drug proceeds.

### A. *Warminster Abbey*

■ The Warminster Abbey business and liquor license were purchased from William H. McCreary for $65,000. Herbert Brener, Esquire, his attorney, so testified (Tr. 2.125); the agreement of sale and bill of sale also recited $65,000 as the purchase price. (Ex. C–1; C–4).

The Government contended that the purchase price was $110,000 because there was a $50,000 under-the-table cash payment. Carl Polchan testified that Robert Sebzda told him that the purchase price was approximately $110,000. (Tr. 1.79). Special Agent Crovetti testified that John Paxson, broker for the sale, told him the purchase price was between $110,000 and $120,000. (Tr. 1.36). While this hearsay was admissible in the probable cause determination, it is unpersuasive to the court of the truth of the matter asserted, that is, the existence of a $50,000 under-the-table cash payment.

The Government also relied on the Pennsylvania Liquor Control Board ("PLCB") field investigation report for the sale of Liquor License R–19229 from Ronray, Inc. to Jamill, Inc.; in the section on the financial responsibility of the applicants, the report stated: "It should be noted that George Leiby, Glenn Leiby and Robert Sebzda value their interest in Abby's Bar, Inc. at $110,000 in which they each have a one-third share." (Ex. G–25). This report was prepared in October, 1980; claimant's valuation was not inconsistent with a $65,000 purchase price in June, 1980, if subsequent improvements were considered; Abby's Bar, Inc.'s records suggests approximately $50,000 in improvements prior to September 30, 1980. (Fixed assets as of June 30, 1980—$10,479, Ex. G–14; fixed

assets as of September 30, 1980—$65,452, Ex. G–17).

Finally, the Government argued it was incredible that McCreary sold the bar and license for $65,000 when he had purchased it four years earlier for $70,000. (Tr. 1.62). But in the absence of any evidence of real estate or liquor license values in that vicinity, either at the time of purchase or sale, the argument fails to convince the court there was a $50,000 under-the-table cash payment.

Having determined that the purchase price was $65,000, the court must next determine to what extent drug proceeds were used to pay that purchase price. Fifty Thousand Dollars was borrowed from the seller, William H. McCreary, by purchase money mortgage, documented by a judgment note (Ex. C–4), a corporate investment note (Ex. C–4), a security agreement (Ex. C–4), an amortization schedule (Ex. C–9) and cancelled checks in payment of the note (Ex. C–10). Abby's Bar, Inc. received from Penn Vending Co. an additional $15,000, according to a letter dated April 28, 1980 from Penn Vending to Leiby, Leiby and Sebzda by which Penn Vending Co. conditionally promised the advance, and a letter dated May 1, 1980 from Herbert Brener to Jay E. Goldfarb, McCreary's attorney, in which Brener stated he had deposited the $15,000 in escrow in accordance with the bill of sale and the agreement between Penn Vending Co. and Abby's Bar, Inc. (Ex. C–3). There is no contention or evidence that the purchase money mortgage or the money from Penn Vending Co. was tainted with drug proceeds.

Claimant has established by a preponderance of the evidence that drug proceeds were not used to purchase Warminster Abbey. The drug proceeds Sebzda and Glenn Leiby admittedly invested in improvements to the premises of Warminster Abbey were invested after the purchase of the business. The investment of drug proceeds may have enhanced the value of the liquor license but the Government has offered no evidence

that the actual cash value of the liquor license at the time this action was commenced was increased by the investment of drug proceeds.[7] Since drug proceeds were not used to purchase the Warminster Abbey business and liquor license, claimant's interest in the liquor license is not subject to forfeiture.

### B. *Spanky's*

Jamill, Inc. purchased Spanky's business and license for $31,000. It borrowed $10,000 from Robert Sebzda's father, Bernard Sebzda, who borrowed the money in turn from his own bank with his savings account as collateral. Claimant introduced in evidence a note from Jamill, Inc. to Bernard Sebzda (Ex. C–23), an affidavit signed by Bernard Sebzda stating the existence of the loan (Ex. C–24), which was prepared by Brener to send to the PLCB, and a bank statement reflecting the $10,000 bank loan (Ex. C–25). There is no contention or evidence that Bernard Sebzda's money was tainted drug proceeds.

In addition, Jamill, Inc. borrowed $10,000 from Abby's Bar, Inc. A check was issued by Abby's Bar, Inc. on December 15, 1980 for this amount. (Ex. C–26). Claimant contends that this $10,000 represented receipts from one week's operation of Warminster Abbey. George Leiby also testified that subsequent to this loan and presumably because of it, a number of checks issued by Warminster Abbey were dishonored for insufficient funds and that this resulted in a PLCB violation. (Tr. 2.168). Roger Ridley, CPA, testified for claimant that in the course of his examination of the corporate books of Abby's Bar, Inc. he saw a December, 1980 bank statement showing a number of checks dishonored in the period covered by the statement. (Tr. 2.202). This supposedly corroborated claimant's testimony that the $10,000 loaned to Jamill, Inc. was available from weekly cash receipts. But there was no documentary evidence to substantiate the bank transactions or action of the PLCB. Furthermore, the records of Abby's Bar, Inc. showed insuffi-

---

**7.** The Government also failed to prove the actual cash value of the liquor license at the time of

purchase but the value on the books of Abby's Bar, Inc. was $10,000. (Ex. G–15—G–21).

cient funds from legitimate (non-drug) operations available to Abby's Bar, Inc. in December, 1980 to have made a $10,000 loan. Abby's Bar, Inc. had a net income of only $3,644 between June 1, 1980 and December 31, 1980. (Ex. G–20).

The remaining $11,000 was paid in cash: $5,000 as a deposit and $6,000 at settlement. Claimant asserts that the $5,000 deposit came from his personal savings (Tr. 2.169) and introduced a $5,000 cancelled check to Herbert Brener. (Ex. C–22). The check evidenced George Leiby's payment to Brener but not the source of the funds. Claimant had been gainfully employed as a controller for 16 years so that it was possible he had a savings account with a balance of at least $5,000. But claimant neither identified this savings account in his testimony nor did he offer a bank statement or passbook establishing either the account, the balance, or the withdrawal. Claimant has failed to convince the court by a preponderance of the evidence that this $5,000 came from personal savings that were not drug proceeds.

Claimant contends that the $6,000 in cash paid at settlement came from weekly receipts from operation of Warminster Abbey. But the books of Abby's Bar, Inc. do not show that such a sum was available from food and liquor sales. Claimant has failed to convince the court by a preponderance of the evidence that this $6,000 came from legitimate business operations rather than drug transactions.

Claimant has established by a preponderance of the evidence that $10,000 of the $31,000 purchase price (32%) was paid for with other than drug proceeds. But this $31,000 purchase price included not only the liquor license but also the business, fixtures and equipment, which are not subjects of this action. In the absence of evidence that any portion of the purchase price was specifically allocated, we must apply the non-drug proceeds and drug proceeds pro rata to all the property purchased, including the liquor license. Since 32% of the purchase price was nondrug proceeds, 32% of the liquor license was also non-drug proceeds. The Government failed to furnish any evidence of the actual cash value of the liquor license at the time this action was commenced; its book value remained constant from the time of purchase.[8] In the absence of any evidence of an increase in value, no increase in value can be attributed to the proceeds of drug exchanges. Therefore, the percentages attributable to non-drug proceeds and proceeds traceable to drug transactions remain constant. Therefore, the claimant is entitled to 32% of the value of his one-third share of the liquor license that is the subject of this action at the time of the seizure and 68% of the value of his share of the liquor license is subject to forfeiture.

### C. *McNally's Bar and Restaurant*

Glemic, Inc. purchased the premises at which McNally's was operated for $198,000. (Ex. C–32). The settlement agreement recites a purchase price of $200,000 but subsequent to the execution of the Agreement, the purchase price was reduced $2,000 by deducting $1,000 from each of the mortgage debts created by the sale.[9]

8. Neither the claimant nor the Government furnished evidence of the value of the liquor license at the time of purchase; the value on the books of Jamill, Inc. is $10,000. (Ex. G–26 and G–27).

9. The settlement agreement also required Glemic, Inc. to assume the indebtedness to the seller of Page 3 Bar, Inc. for the purchase of the business, equipment and liquor license of McNally's in the amount of $28,229.32, plus interest. (Ex. C–32). On March 6, 1981, Glemic, Inc. entered into an Agreement of Sale with Page 3 Bar, Inc. for the purchase of the license, equipment and fixtures of McNally's for a total of $36,814.40, including the assumption of the debt owed to Marguerite Eliades and the assumption of an indebtedness to Robert Sebzda originally owed to Penn Finance Co. but assigned to him on January 22, 1980. (Ex. C–34). The fixtures and equipment are subject of this forfeiture action; this liquor license is not. The purchase price of $36,814.40 for the business of McNally's was unallocated, but the value of the license on the books of Glemic, Inc. on September 1, 1981 was $35,000 (Ex. C–35) so that it appears that at the time of purchase by Glemic, Inc. the equipment and fixtures of McNally's were virtually worthless.

On execution of the agreement, $20,000 was paid by George Leiby from a joint checking account with Glenn Leiby. (Ex. C–33). Claimant contends that this $20,000 represented accumulated savings. (Tr. 2.170). But the check showed only the payor and payee not the source of the funds. In claimant's income tax return for 1980 (Ex. C–30), he reports interest income in the amount of only $552; if claimant had accumulated legitimate savings of $20,000 by March 6, 1981, the date of the check, his interest income for 1980 should have been higher than $552. Claimant provided no credible explanation for this.

Glemic, Inc. executed a purchase money mortgage in the principal amount of $89,000 and assumed a mortgage outstanding from Marguerite Eliades to John McNally in the amount of $59,000, in accordance with the settlement agreement. (Ex. C–32). A mortgage from Marguerite Eliades to Glemic, Inc. filed with the Recorder of Deeds of Bucks County, Pennsylvania on August 7, 1981, and cancelled checks on both mortgages were introduced in evidence. (Ex. C–36). There is no contention or evidence that the mortgages were tainted with drug proceeds.

The $30,000 balance on the purchase price was paid in cash at settlement. Claimant contends this was from his and Glenn Leiby's personal savings. There is no evidence or reason to believe either of the Leibys could have accumulated savings in this amount from legitimate sources. On the evidence before the court, this money could only have been derived from drug transactions. Claimant has established by a preponderance of the evidence that only $148,000 of the $198,000 purchase price of McNally's premises was paid for with non-drug money.

Subsequent to purchase, $100,000 in improvements to McNally's were financed by Acceptance Associates of America, Inc. The mortgage from Glemic, Inc. to Acceptance Associates of America, Inc., filed with the Recorder of Deeds of Bucks County, Pennsylvania on October 27, 1981, and cancelled checks in payment of the mortgage were in evidence. (Ex. C–37). There is no evidence or contention that the loan received from Acceptance Associates of America, Inc. was tainted by drug proceeds.

On June 20, 1983 the court approved a stipulation of counsel that the proceeds from any sale of McNally's, except for the proceeds attributable to McNally's liquor license, PLCB License No. 18284, not the subject of this action, and less payment of usual and customary expenses, fees and settlement costs and other expenses and/or liabilities of the corporation, would be deposited with the court in an interest-bearing account. On October 28, 1983, an Agreement of Sale for McNally's in the amount of $535,000 was executed. (Ex. G–41). On February 10, 1984, McNally's was sold pursuant to the Agreement of Sale.

The Agreement of Sale for McNally's allocated $35,000 to the liquor license and amusement permit, which are not the subject of this action, so that the sales price of the property subject to forfeiture was $500,000. Claimant offered no explanation for the difference between the sales price, $500,000, and the purchase price, $198,000, except for $100,000 in admitted improvements; there is $202,000 for which claimant has not accounted. This unaccounted-for $202,000 might reflect the good will of the business, might be appreciation due to inflation, but also might reflect the infusion of additional drug money into the business. The burden of proof being on the claimant and no explanation having been offered for this appreciation, this $202,000 is subject to forfeiture.

To meet the purchase price of McNally's, the buyers assumed Glemic's outstanding debts in excess of $198,000, including $44,126 owed John McNally on the first mortgage, $72,849 owed Marguerite Eliades on the second mortgage and $42,391 owed Acceptance Associates of America, Inc. In addition, as of April 3, 1986, unsecured creditors of Glemic, Inc., including claimant's attorney, received disbursements from the escrow account in excess of $80,-

000 pursuant to the prior stipulation of the parties.

Claimant has established that $248,000 of the proceeds of sale ($148,000 attributed to the initial purchase price and $100,000 in subsequent improvements) is not subject to forfeiture. But the assumption of debts by the agreement of sale and the payments to unsecured creditors from the proceeds of sale have already benefited the former owners of McNally's in an amount ($278,-000) in excess of that which is not forfeitable ($248,000) so that after all payments pursuant to the stipulation have been made, claimant's one-third share of that which remains or will be deposited into the escrow account is subject to forfeiture.[10]

### III. *Innocent Owner Defense*

[9] Claimant's final claim is that he had no knowledge of the connection between the property subject to forfeiture and violations of law and that as an innocent owner his property was not subject to forfeiture. Title 21 U.S.C. § 881(a)(6) provides that "no property shall be forfeited ... to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of the owner." *Id.* Under 21 U.S.C. § 881(a)(6), the Government need not prove the claimant had knowledge. Rather, the burden is on the claimant to prove the absence of knowledge. *United States v. Four Million Two Hundred Fifty-Five Thousand Dollars in U.S. Currency,* 762 F.2d 895, 907 (11th Cir.1985). It has been argued that the owner must establish not only lack of actual knowledge but also lack of negligence, that is, that the owner neither knew nor had reason to know of the act or omission involved. But *United States v. Four Million Two Hundred Fifty-Five Thousand Dollars in U.S. Currency* held that the innocent owner defense turns on claimant's actual knowledge not constructive knowledge even though the claimant bears the burden of proving the absence of that actual knowledge and the government need not prove its presence. *Id.* at 905.

The Government relies on *Calero-Toledo v. Pearson Yacht Leasing,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), where the Supreme Court held that the seizure of a yacht pursuant to a Puerto Rican statute providing for forfeiture of vessels used to transport controlled substances did not deprive the yacht owner of his property in violation of the Fifth Amendment. Unlike the forfeiture statute here at issue, the Puerto Rican statute provided no defense to the "innocent owner." The owner-lessor in *Calero-Toledo* was neither involved in nor aware of the act of the lessees which resulted in the yacht's forfeiture. Although holding the forfeiture constitutional, the Court added, "it has been implied that it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken away from him without his privity or consent.... Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent proscribed use of his property...." 416 U.S. at 689, 94 S.Ct. at 2094. Consequently, the Government argues that to be an "innocent" owner requires not only lack of actual knowledge but also due care to prevent illicit use of the property, at least as to property from which contraband itself has been seized.

Resolution of the extent of constitutional rights against forfeiture under a statute without any reference to the rights of an innocent owner is here unnecessary because this complaint in forfeiture proceeds under a statute that does provide for a defense to an "innocent owner." Congress in enacting an innocent owner defense with

---

**10.** There is no evidence of the actual value of McNally's at the time this action was initiated. Claimant contends that as a consequence of this forfeiture action business declined (Tr. 2.177) so that the value of the business at the time the action was initiated was greater than its value at the time of sale. But any depreciation in value during this interim period was at the Government's risk since any and all proceeds in excess of $248,000 were subject to forfeiture.

regard to forfeiture of drug proceeds may have determined to give more legal protection to claimants than the Constitution requires. Perhaps this is because drug transaction proceeds are so easily commingled and transformed that an owner might be uninvolved and unaware of the illegal derivation of proceeds invested in his or her property. Whatever the reason, if claimant were an innocent owner, his interest in the properties the subject of this action would not be forfeited.

■ Supreme Court dicta on what may be constitutional with regard to a statute providing no defense to an innocent owner does not aid in determining whether a statute that does provide such a defense requires the owner to lack actual knowledge only or also lack knowledge that could have been acquired by non-negligent conduct. Resolution of this issue is unnecessary to the disposition of this claim. Because of George Leiby's official position and the time he spent at the bars involved, his demeanor and the credibility of the evidence in its entirety, George Leiby has not convinced the court by a preponderance of the evidence that he did not have actual knowledge of the underlying crimes and that drug proceeds were invested in the properties.

## IV. *Constitutionality of Forfeiture Statutory Provisions*

Claimant and the American Civil Liberties Union ("ACLU") as *amicus curiae* contend that § 881(a)(6) violates Article III of the Constitution and the Fourth, Fifth and Sixth Amendments.[11]

Claimant and the ACLU argue that § 881(a)(6) permits unreasonable seizures in violation of the Fourth Amendment because it allows seizure of property without a neutral determination of probable cause. Section 881(a)(6) defines what is forfeitable; § 881(b) provides for its seizure. Section 881(b) permits warrantless seizure of conveyances and other property if the Government has probable cause to believe that the

property has been used or is intended for use in violation of the subchapter. But there never was a warrantless seizure of these properties; there was a warrant of seizure obtained by the Government from a Magistrate. When the warrant of seizure was quashed almost immediately thereafter, this action proceeded on a complaint in forfeiture under the Supplemental Rules in Admiralty. Therefore, whether a warrantless seizure would violate the Fourth Amendment is not relevant to this action.

■ Claimant's next argument is that § 881(a)(6) permits forfeiture of estates in violation of Article III, Section 3, Clause 2 of the Constitution, which provides:

"That Congress shall have the power to declare the Punishment of Treason, but no Attainder of Treason shall work corruption of the blood, or forfeiture except during the life of the person attained."

In 1790, Congress enacted 18 U.S.C. § 3563 which additionally provides that, "no ... conviction or judgment shall work ... any forfeiture of estate." Both the Constitution and that statute prohibit the forfeiture of a person's estate by reason of a federal criminal conviction. But § 881(a)(6) provides for a *civil* proceeding *in rem* independent of and unaffected by any criminal proceedings *in personam*. The Article III and statutory prohibitions of forfeiture of estate do not apply to this proceeding against these properties.

■ Claimant and the ACLU also contend that § 881 permits criminal punishment by a civil burden of proof in violation of the Fifth and Sixth Amendments. In *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361, 368 (1984), the Supreme Court reiterated the test enunciated in *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), for distinguishing criminal from civil sanctions:

Our inquiry in this regard has traditionally proceeded on two levels. First, we have set out to determine whether Congress, in establishing the penalizing

---

**11.** On June 6, 1984, the court granted the ACLU leave to file an *amicus curiae* brief.

mechanism, indicated either expressly or impliedly a preference for one label or the other (citation). Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention. "[O]nly the clearest proof" will suffice to establish the unconstitutionality of a statute on that ground. *One Assortment of 89 Firearms,* 104 S.Ct. at 1106.

Congress has clearly indicated that § 881(a)(6) is a "civil in rem" proceeding rather than a "criminal" sanction. The Comprehensive Drug Abuse Protection and Control Act of 1970 includes § 881(a)(6) within "Administrative and Enforcement Practices" (Part E) not "Offense and Penalties" (Part D) and expressly provides the civil procedures of the customs laws for these *in rem* proceedings. *See United States v. $2,500.00 in U.S. Currency,* 689 F.2d 10 (2d Cir.1982), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123, *reh'g denied,* 466 U.S. 994, 104 S.Ct. 2376, 80 L.Ed.2d 848 (1984).

■ Nor is there the "clearest proof" that the purpose or effect of the statute is so punitive it negates Congressional intent to enact a civil penalty. The legislative history of § 881(a)(6) clearly suggests that § 881(a)(6) is designed to serve broad, nonpunitive purposes. These remedial purposes include removing the incentive to engage in the drug trade by denying drug dealers the proceeds of illgotten gains, stripping the drug trade of its instrumentalities, including money, and financing Government programs designed to eliminate drug trafficking. *Id.*[12] 95th Cong., 2d Sess., 124 Cong.R. 23055–23057; 7 U.S. Code Cong.R. & Ad.News, 9496, 9523 (1978).

■ Historically, forfeitures have always been regarded as civil. *See United States v. Regan,* 232 U.S. 37, 34 S.Ct. 213, 58 L.Ed. 494 (1914) (tracing the civil nature of forfeiture back to its earliest origins). This forfeiture statute, like its predecessors, is civil and the protections afforded a criminal defendant are not required. *See United States v. $2,500.00 in U.S. Currency,* 698 F.2d at 10.

Claimant and the ACLU also contend that § 881 violates the Due Process Clause of the Fifth Amendment because it permits the seizure of property without pre- or post-seizure notice and hearing. But the original warrant of seizure obtained by the Government from the Magistrate was quashed by this court almost immediately thereafter and the property seized returned to claimant. This action is proceeding on a complaint in forfeiture under the Supplemental Rules of Admiralty. Claimant does not request monetary relief for deprivation of property. He seeks only declaratory relief and a restraining order. It is well established that a court should not consider constitutional issues unless it is necessary. Because the court quashed the warrant of seizure, the case is proceeding on a complaint in forfeiture and there is no claim for monetary relief, it is not necessary for the court to determine in this action whether § 881 comports with the Fifth Amendment regarding notice and hearing.

■ Finally, claimant argues that § 881(a)(6) is unconstitutionally vague because it is not clear what is meant by the term "proceeds traceable." Although the scope of the statute is broad, the statute's express language is clear and precise and not unconstitutionally vague. *See United States v. Premises Known As 8584 Old Brownsville Road,* 736 F.2d 1129 (6th Cir. 1984).

All facts referred to in this discussion shall be deemed incorporated in the court's

---

12. Contrary to the ACLU's assertion, property purchased with drug proceeds may be considered guilty property. Property subjected to forfeiture because it is exchanged for illegal drugs or purchased with proceeds of illegal drug transactions is the same contraband property although changed in form. The law provides for forfeiture of property which is the proceeds of an illegal drug transaction only if there is a traceable connection between such property and the illegal exchange of controlled substances.

specific Findings of Fact preceding this discussion.

## Conclusions of Law

The Government established probable cause to initiate this forfeiture action—that is, probable cause to believe that there were drug transactions and that proceeds from said transactions were invested in defendant properties.

The Government having done so, the burden of proof shifted to the claimant to prove by a preponderance of the evidence that defendant properties are not forfeitable, that is, that they were not purchased with drug proceeds.

Claimant established by a preponderance of the evidence that his one-third interest in liquor license R–19233, owned by Abby's Bar, Inc., is not forfeitable.

Claimant established by a preponderance of the evidence that a 32% interest in liquor license R–19229, owned by Jamill, Inc., is not forfeitable. The Government is entitled to a 68% inchoate interest in his share of said license.

Claimant has established by a preponderance of the evidence that $248,000 of the sale proceeds of McNally's is not forfeitable. Claimant's one-third interest in the proceeds in excess of $248,000 is forfeitable.

Claimant is not an "innocent owner" within the meaning of 21 U.S.C. § 881(a)(6).

Section 881(a)(6) is not in violation of Art. III, § 3, cl. 2, which prohibits forfeiture of estates.

Section 881(a)(6) is civil and remedial and does not violate any of claimant's Fourth, Fifth or Sixth Amendment rights.

### ORDER (No. 83–3266)

AND NOW, this 4th day of April, 1986, in accordance with the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that Judgment is entered in favor of defendants.

### FINAL JUDGMENT (No. 83–1829)
*Re: Claim of George Leiby*
*Pursuant to Rule 54(b)*

AND NOW, this 4th day of April, 1986, in accordance with the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that:

1. Claimant's interest in Liquor License No. R–19233 owned by Abby's Bar, Inc. is not subject to foreclosure and claimant's interest therein is adjudged free of any lien at said forfeiture.

2. Claimant's interest at the time of seizure in Liquor License No. 19229 owned by Jamill, Inc. to the extent of 68% of its value is subject to forfeiture; title, possession and control thereof is transferred to the United States.

3. Claimant's interest in the proceeds of sale which have been or will be deposited into the court's interest-bearing escrow account are subject to forfeiture and title, possession and control thereof is transferred to the United States subject to the payment of remaining expenses and/or liabilities of the corporation in accordance with the agreement of the parties herein.

4. The court directs the entry of a final judgment as to the claim of George Leiby, upon determination that there is no just reason for delay.