UNITED STATES of America, Plaintiff,

v.

ONE PARCEL OF PROPERTY KNOWN AS 4.14 ACRES IN THE 19TH G.M. DISTRICT OF BRYAN COUNTY, GEORGIA, with all appurtenances thereto, and all improvements thereon, said property being titled in the name of Easter Mae Jenkins, Defendant.

No. CV 491–285.

United States District Court,
S.D. Georgia,
Savannah Division.

Sept. 8, 1992.

James L. Coursey, Jr., Savannah, Ga., for plaintiff.

Ronald K. Thompson, Tybee Island, Ga., for defendant.

## ORDER AND MEMORANDUM

NANGLE, District Judge.

This civil action *in rem* was brought to enforce the provisions of 21 U.S.C. § 881(a)(7) for forfeiture of real property which was used or intended to be used to commit or to facilitate the commission of a violation of 21 U.S.C. § 801 *et seq.* The issue at trial was whether the claimant had actual knowledge of or consented to the use of her property in drug transactions. After consideration of the pleadings, the testimony of witnesses, and the exhibits at trial, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Easter Mae Jenkins is the fee simple owner of the defendant real property known as 4.14 acres in the 19th GM District of Bryan County, Georgia. Ms. Jenkins purchased the property in 1982 with insurance proceeds from her husband's death, and resides there with her son, her daughters Sharon Jenkins and Jennifer Jenkins Holloway, and two grandchildren.

2. In December 1989, Lieutenant Karl T. Kile, Chief Investigator for the Major Crime/Drug Task Force, Pembroke Police Department, worked a continuing drug investigation with the Fort Stewart CID Drug Unit.

3. At 5:55 p.m. on December 13, 1989, CID Investigator John Y. Ford was issued $100.00 in U.S. Government funds by CID Agent (S/A) Howard Sander to use in an anticipated controlled purchase of crack cocaine from Sharon Jenkins and Arthaniel Johnson, dealers targeted by the investigation.

4. At 6:50 p.m. on December 13, 1989, Agent Sander, Investigator Ford, and Lieutenant Kile met with a confidential informant (CI). After Agent Sander and Lieutenant Kile met with a confidential informant (CI). After Agent Sander and Lieutenant Kile briefed Investigator Ford and the CI, they left for Benton Street, Arthaniel Johnson's usual location, at approximately 7:15 p.m. The CI rode in Ford's vehicle, while Kile and Sander conducted mobile surveillance on Benton Street about 200 yards from the point where Ford and the CI met with Johnson.

5. Johnson was known to be a crack cocaine dealer by the Pembroke Police Department. When Investigator Ford asked him if he had any crack cocaine for sale, Johnson stated that he was out but would take them to a friend's house. Johnson got into Ford's vehicle with Ford and the CI and directed them to the Jenkins' residence. Agent Sander and Lieutenant Kile maintained mobile surveillance of Investigator Ford's vehicle while en route to the Jenkins' residence. Sander and Kile parked just down from the residence to maintain surveillance.

6. At 7:55 p.m. on December 13, 1989, Investigator Ford arrived at the Jenkins' residence to purchase $80.00 of crack cocaine. Investigator Ford, Johnson, and the CI left the vehicle and were met by Sharon Jenkins in the front yard. A few minutes later, Johnson took a piece of crack cocaine from Sharon Jenkins as his payment for introducing Investigator Ford to Sharon Jenkins. Ford gave $80.00 in prerecorded government funds to Sharon Jenkins in payment for the cocaine, and Jenkins handed Ford $10.00 in change. This transaction occurred in the front yard of the Jenkins' residence.

7. At 8:08 p.m. on December 13, 1989, Ford, Johnson, and the CI left the Jenkins' residence. Investigator Ford returned Johnson and the CI to their respective residences. Ford later met Agent Sander and Lieutenant Kile, and Sander took possession of the suspected cocaine purchased from Sharon Jenkins.

8. At 9:20 p.m. on December 13, 1989, Agent Sander administered a field test on the suspected crack cocaine purchased from Sharon Jenkins. The substance showed positive results for cocaine.

9. Lieutenant Kile transported the evidence to the Georgia Crime Lab in Savannah. The Crime Lab's analysis showed that the sample purchased from Sharon Jenkins tested positive for cocaine.

10. From December 31, 1989, through March 1, 1990, Lieutenant Kile conducted random surveillance of the Jenkins' residence. During these observations, police noted that a large number of people, including persons who had been identified as known drug offenders from task force reports and records, went into the Jenkins' residence. These visitors generally stayed less than five minutes, and returned several times in the same night in many cases.

11. On March 2, 1990, a state arrest warrant for Sharon Jenkins and a search warrant for the residence of Easter Mae Jenkins were obtained from Judge Arthur R. Hawkins, Chief Magistrate Judge of Bryan County.

12. At approximately 8:00 p.m. on March 3, 1990, members of the Bryan County Sheriff's Department, the Pembroke Police Department, and the Fort Stewart CID Drug Unit executed the arrest warrant for Sharon Jenkins and the search warrant for the residence of Easter Mae Jenkins.

13. Easter Mae Jenkins testified that as she saw the police automobiles coming into her front yard she went into her bathroom, removed eight pieces of rock cocaine from the back of the toilet, and attempted to flush them down the toilet. This cocaine belonged to Jennifer, and Ms. Jenkins attempted to flush it to keep her daughter from getting into trouble. Chief Jeffrey Simmons of the Pembroke Police Department followed Ms. Jenkins to the bathroom, and recovered from the toilet a white napkin which contained eight pieces of suspected crack cocaine.

14. Sharon Jenkins ran into the bathroom at the other end of the residence when officers entered the residence. Detective G.M. Christian caught her in the bathroom at the north end of the residence. Officers found a homemade smoking device on the sink in this bathroom. Residue on the device later tested positive for cocaine.

15. During the search of the residence, Lieutenant Kile recovered a match box containing powdered cocaine on a dresser and a homemade smoking device made out of a Minute Maid drink can under the sink in Easter Mae Jenkins' bathroom. The Minute Maid can later tested positive for cocaine. Easter Mae and Sharon Jenkins both testified that the powdered cocaine belonged to Jennifer Jenkins Holloway.

16. After a complete search of the residence, all seven persons detained at the residence were transported to the Bryan County Sheriff's Department. Jennifer Jenkins Holloway was searched by a female Bryan County dispatcher, who recovered a piece of tin foil containing three pieces of crack cocaine.

17. At trial, Sharon Jenkins admitted that she sold crack cocaine to an undercover agent in the front yard of her mother's home. Prior to her arrest, Sharon sold crack cocaine from the defendant residence and elsewhere; as a result, she had a number of regular cocaine customers who came to her mother's house numerous times during primarily the evening hours to purchase crack cocaine.

18. At least five guns were located within the defendant residence.

19. The front and back doors of the residence were secured by regular door locks and by a 2″ × 4″ piece of lumber wedged under the door knobs.

20. Jennifer Jenkins Holloway wrote the following note and taped it to her mother's door:

> Everybody stay in the front room and wait for what you want unless instructed other wise. An that goes for mens and women kin or no kin. So please dont trespass in my room. The owner Easter Mae Jenkins And use the other bathroom.

Easter Mae Jenkins testified that this note had been on her bedroom door for approximately two months prior to her arrest. She believed that it meant that her daughters' guests were to stay out of her bedroom and bathroom. Easter Mae Jenkins has a fifth-grade education and difficulty reading.

21. Jennifer Jenkins Holloway has an extensive history of drug use. Her mother and sister testified that she had been using drugs for the past twelve years. At the

time that the search warrant was executed, Jennifer shared a bedroom with her mother in the defendant residence. Easter Mae Jenkins knew that Jennifer had a serious drug problem, had been hospitalized for her addiction, and had used drugs in her home. She told her daughter to "get them [drugs] out" of the house several times before March 1990.

22. Easter Mae Jenkins was arrested during the execution of the March 3, 1990, search warrant and later charged with various violations including possession of cocaine with intent to distribute. Ms. Jenkins pled not guilty. At the trial on these charges in the Superior Court of Bryan County, Ms. Jenkins was convicted of possession of cocaine (a lesser included offense of possession with intent to distribute) and served approximately six months of a three year sentence. Easter Mae Jenkins has no record of any other prior convictions.

23. Sharon Jenkins was also arrested on March 3, 1990, and charged with possession of cocaine and sale of cocaine. Sharon Jenkins pled guilty to these charges and was sentenced to three years probation and fined by the State of Georgia.

24. On November 20, 1991, the United States filed a claim alleging that the defendant property was subject to forfeiture under 21 U.S.C. § 881(a)(7).

### Conclusions of Law

This Court has jurisdiction of this matter under 28 U.S.C. §§ 1345 and 1355 and 21 U.S.C. § 881. Venue is proper in the Southern District of Georgia pursuant to 28 U.S.C. § 1395 and 21 U.S.C. § 881(j). The claimant, Easter Mae Jenkins, has standing to contest this forfeiture action since she is the record owner of the defendant property.

 Federal law provides that certain property used in Title 21 drug transactions

shall be forfeited to the United States. This property includes

[a]ll real property, including any right, title and interest ... in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act of omission established by that owner to have been committed or omitted *without the knowledge or consent of that owner.*

21 U.S.C. § 881(a)(7) (Supp.1991) (emphasis added). Although neither Easter Mae nor Sharon Jenkins were charged with Title 21 violations, section 881(a)(7) still applies since "civil forfeiture does not require a prior criminal conviction or even a prior criminal proceedings." *United States v. Property Identified as 908 T Street, N.W., Washington, D.C.,* 770 F.Supp. 697, 702 (D.D.C.1991).

 At trial, the United States established probable cause[1] to believe that the defendant property had been used to facilitate the commission of drug transactions. The burden then shifted to the claimant, Easter Mae Jenkins, to prove a defense to the forfeiture by a preponderance of the evidence. *United States v. One Parcel of Real Estate at 1012 Germantown Road, Palm Beach County, Florida,* 963 F.2d 1496 (11th Cir.1992).

 To establish an innocent owner defense under 21 U.S.C. § 881(a)(7), a claimant must prove more than mere innocence. *United States v. Certain Real and Personal Property Belonging to Hayes,* 943 F.2d 1292 (11th Cir.1991). A claimant may avoid forfeiture of her property by proving *either* ignorance of the illegal activity occurring on her premises or a lack of con-

1. In forfeiture cases, the United States establishes probable cause by proof that "a substantial connection exists between the property to be forfeited and an illegal exchange of a controlled substance." *United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale,* 803 F.2d 625, 628 (11th Cir.1986). The United States demonstrated the required substantial connection by presenting proof of the extensive investigation of Sharon Jenkins and the surveillance of the Jenkins' residence.

sent to that activity. *1012 Germantown Road,* 963 F.2d at 1503. While this Court believes that Easter Mae Jenkins was not personally involved in the drug transactions occurring in her home, the evidence adduced at trial indicates that she cannot take advantage of either aspect of the innocent owner defense.

### 1. *Lack of Knowledge*

■ The application of the innocent owner defense turns on the claimant's actual, not constructive, knowledge. *United States v. Four Million, Two Hundred Fifty–Five Thousand,* 762 F.2d 895 (11th Cir. 1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986).[2] When determining this issue, the Court does not need to find that the claimant had actual knowledge; instead, the claimant must prove the absence of actual knowledge. *Id.* at 907. In *Four Million, Two Hundred Fifty–Five Thousand,* the Eleventh Circuit found that the claimant was not an innocent owner where "it is reasonable to believe that an owner of property *is aware* that the property is ... involved in the narcotics exchange business." *Id.* at 906 (emphasis in original).

■ Ms. Jenkins did not prove that she lacked knowledge of the use of her house in drug transactions. The combination of frequent visitors, the note referring to business dealings, and the cache of weapons located in the defendant residence convince this Court that the claimant cannot avoid forfeiture under this prong of the innocent owner defense.

### a. The Amount of Activity in the Jenkins' Residence

At trial, Ms. Jenkins testified that she knew that people came to her house while she was working because they left tire marks in her front yard. Although Ms. Jenkins claimed that she never asked her daughters why these people visited her home, the testimony concerning a note on Ms. Jenkins' bedroom door casts doubt on this statement.

Two months before police searched the Jenkins' residence, Jennifer wrote the following note and placed it on her mother's bedroom door:

> Everybody stay in the front room and wait for what you want unless instructed other wise. An that goes for mens and women kin or no kin. So please dont trespass in my room. The owner Easter Mae Jenkins And use the other bathroom.

Jennifer testified that she put this message on her mother's door since her mother was aggravated by the number of people who came to her house. Both Sharon and Jennifer indicated that Jennifer had discussed the note with their mother; it is difficult to believe that Ms. Jenkins never inquired about or knew the meaning of "wait for what you want."

Additionally, the number of people who came into the house also goes to the claimant's failure to prove her lack of actual knowledge. Sharon estimated that approximately six people came to the house on weeknights, and that regular customers would visit about thirty times each week. In *Property Belonging to Hayes,* the claimant's husband used their residence as a drop-off point for cocaine deliveries. The Court found that the regular (although not constant) activity at the claimant's residence was sufficient to "raise[ ] an inference that the claimant was not entirely ignorant of the circumstances surrounding her husband's activities." *Property Belonging to Hayes,* 943 F.2d at 1297.

In light of the number of regular visitors at her residence, Ms. Jenkins presented little evidence at trial that proved her ignorance. Although Ms. Jenkins worked from 9:00 a.m. to 4:00 p.m. and from 11:00 p.m. to 4:00 a.m. six days a week, the drug transactions at her home occurred primari-

---

**2.** Although *Four Million, Two Hundred Fifty-five Thousand* involved 21 U.S.C. § 881(a)(6), the Eleventh Circuit has noted that the legislative history of the innocent owner defense in § 881(a)(7) mentions the § 881(a)(6) defense by way of comparison. *1012 Germantown Road,* 963 F.2d at 1505. It concluded that it is "appropriate to apply the section 881(a)(6) definition ... to a section 881(a)(7) proceeding." *Id.*

ly during the evening hours. On direct examination, Sharon Jenkins testified that her mother knew the people who came to the house and had an idea of why they were coming. Between the regular activity in her home and the damaging testimony presented by her daughter, the claimant did not prove that she had no actual knowledge of the drug transactions conducted in her home.

### b. The Presence of Weapons

The use of homemade security devices on the doors and presence of numerous weapons in the residence also denote Ms. Jenkins' failure to prove lack of knowledge. Ms. Jenkins denied that the guns and devices were used to prevent drug thefts, and attributed their presence to the need for security. (The house is located three miles from Pembroke city limits, and the nearest neighbor is a quarter-mile away.) Although the remote area may justify the desire to own a single weapon, Ms. Jenkins' testimony did not demonstrate that there had been any violence or criminal acts in the area to explain the need for approximately five guns scattered around the house.

In light of all of the evidence presented on this issue, Ms. Jenkins cannot avoid forfeiture of her property on the ground that she had no knowledge of its use in drug transactions.

### 2. Lack of Consent

█ If the claimant is unable to prove lack of actual knowledge, she may also avoid forfeiture by proving lack of consent. See 21 U.S.C. § 881(a)(7) (Supp.1991). The Eleventh Circuit recently defined consent in § 881(a)(7) actions as "a failure to take all reasonable steps to prevent the illicit

use of one's property." [3] *1012 Germantown Road*, 963 F.2d at 1506. As an example of a situation where the owner took all reasonable efforts to prevent drug transactions from occurring on his property, the Court in *1012 Germantown Road* cited *United States v. Property Identified as 908 T Street, N.W., Washington, D.C.*, 770 F.Supp. 697, 702 (D.D.C.1991).

The owner of the defendant property in *908 T Street* had nine children, six of whom used or had used drugs. When police searched the home in 1984, 1986 and 1988, officers found a vast quantity of drugs. At the forfeiture trial following the 1988 search, the Court found that the owner had taken all reasonable efforts to prevent the use of his property in drug transactions. In so holding, the district court relied on one daughter's testimony that

> ... her father nailed up windows, put locks on doors, "things like that" ... from 1986 to 1988, there was no reason to believe that her father's home was being used for the facilitation of narcotics activities: Her addicted siblings "had been put out" of the house "to fend for themselves"; no one living permanently at 908 T Street, N.W. during that time used drugs; and [one of the children who used drugs], when he was released from prison in 1987 or early 1988, was living at a halfway house where he was monitored, was permitted to visit his family every weekend, consistently tested negative for drugs, and attended a narcotics rehabilitation program.

*908 T Street, N.W.*, 770 F.Supp. at 701.

In the case at bar, Easter Mae Jenkins "fussed" at her daughter Jennifer for using drugs and told her daughters that she did not want any drugs in the house.[4] De-

---

**3.** The "all reasonable efforts" standard comes from dicta in *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 689, 94 S.Ct. 2080, 2094–2095, 40 L.Ed.2d 452 (1974) (citations omitted): "It therefore has been implied that it would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent ... Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the

wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property ..."

**4.** The case at bar differs from *United States v. Real Property at 5000 Palmetto Drive*, 928 F.2d 373 (11th Cir.1991). In that case, the claimant permitted her son to live rent-free on the defendant property as long as he did not do anything illegal on the premises. She repeatedly denied any knowledge of her son's drug transactions on the property. Although these facts sound simi-

spite her belief that her pleas would be sufficient, she should have called the police department or the Drug Enforcement Agency for help with her children. *See United States v. Sixty Acres in Etowah County*, 930 F.2d 857, 861 (11th Cir.1991) ("... [We] insist that claimants under no immediate threat of reprisal ... communicate their knowledge to police ..."). She did not throw her daughters out of the house because she was concerned about providing shelter for their young children. Although Ms. Jenkins' maternal love and concern for her grandchildren are certainly commendable, her actions do not constitute reasonable efforts to prevent the use of her property in drug transactions. Since Ms. Jenkins has not proven lack of actual knowledge or lack of consent, the innocent owner defense of 21 U.S.C. § 881(a)(7) is not applicable.

It is with great regret that this Court orders forfeiture of the defendant property to the United States. Congress had two aims in enacting 21 U.S.C. § 881(a)(7): "to punish criminals while insuring that innocent persons are not penalized for their unwitting association with wrongdoers." *United States v. One Single Family Residence with Out Buildings Located at 15621 S.W. 209th Avenue, Miami, Florida*, 894 F.2d 1511, 1513 (11th Cir.1990). In light of these purposes, it seems unduly harsh to order the forfeiture of Easter Mae Jenkins' home. Although loss of the family dwelling will somewhat punish Sharon, the perpetrator of the Title 21 offenses,

Easter Mae Jenkins will bear the full effect of the forfeiture.[5] She loses the home that she prudently purchased with proceeds from her husband's wrongful death settlement because she continued to provide for her daughters through hard work even when their treatment of her was reprehensible and their respect for her minimal. Unfortunately, the law requires this result. Accordingly,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the defendant property be and is forfeited to the United States of America. The Court will address third party interests and the disposition of the property by separate order of the Court.

lar to the testimony adduced at the present trial, several noticeable differences exist. First, the claimant did not live at the defendant property; she only visited it on a regular basis to clean. Secondly, the F.B.I. agent testifying for the United States acknowledged that no contraband was ever seen on the property, no purchase or sale of drugs was observed, and no search warrant was executed. The Eleventh Circuit upheld the trial court's determination that the claimant was an innocent owner since "it [was] simply unknown how obvious drug activity was on the premises." *Id.* at 376.

Ms. Jenkins' situation was completely different. Unlike the claimant in *5000 Palmetto Drive*, she did not condition her daughters' residence in her home upon their not doing anything illegal. She merely "fussed" at them and

told them to get the drugs out. She lived at the premises and saw controlled substances lodged in her bedroom. Testimony about the frequent visitors also distinguish the two actions since drug activity appeared to be fairly obvious at the Jenkins' residence.

5. The Court notes that this pattern seems to be fairly common in this case. When officers searched the Jenkins' home on March 3, 1990, they arrested both Sharon and Easter Mae Jenkins. Sharon, whose activities led to the search of the residence, pled guilty to charges of possession and sale of cocaine. She received three years probation and a fine. On the other hand, Easter Mae Jenkins pled not guilty to charges filed against her, was convicted of possession by the jury, and served six months of a three year sentence.